**In re HOME EXPRESS, INC., Debtor.**

**Bankruptcy No. 96–41046 N.**

United States Bankruptcy Court,
N.D. California.

July 2, 1997.

---

Garrett L. Cecchini, Kaufman & Logan, San Francisco, CA, for Debtor.

## FINDINGS OF FACT AND CONCLUSION OF LAW REGARDING JOINT MOTION TO AMEND THE ORDER ON FEE PAYMENTS TO PROFESSIONALS

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 11 case is before the Court pursuant to a "Joint Motion to Amend the Order on Fee Payments to Professionals" in this case under 11 U.S.C. § 328(a) [1]. A hear-

---

1. That section states in pertinent part as follows: The trustee, or a committee ..., with the court's approval, may employ ... a professional person ... on any reasonable terms and conditions of employment.... Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and con-

ing on this motion was conducted on June 11, 1997 during which the parties introduced documentary submissions and made oral arguments. Based upon those submissions, the court hereby makes the following findings of fact and conclusions of law.

Home Express is in the business of selling housewares and household dry goods. Prior to the filing of this case on February 7, 1996, it had thirty-three stores operating in seven states with annual revenues of approximately $230 million and approximately 2000 employees. Its schedules list assets of $115,262,582, liabilities of $75,384,086 and some 16,000 creditors. The company's stock is not publicly traded.

This is Home Express' second journey through Chapter 11. At the time of its first filing in 1990, it was a twelve-store retail chain centered mainly in the Bay Area. It emerged from that case as a five-store chain. It promptly embarked upon a rapid (and ill-planned) expansion program. The addition of twenty-eight stores spread out from Nebraska to Texas to California, combined with a fundamental failure to identify its customer base and niche in the retailing industry, led to its second filing. The company was losing money when it filed, and according to its monthly operating reports, it has lost at least $2 million every month (except for December of 1996, when it showed a small profit) since filing.

Since filing its Chapter 11 petition, the company has been beset by the usual assortment of problems experienced by other failed retail establishments in reorganization proceedings. Its decision to file was made virtually overnight and with no warning to its suppliers, resulting in over 100 reclamation claims and unusually hard feelings among the creditor body. After some initial jockeying for position and initiation of litigation over the validity of individual reclamation claims, the parties engaged in extended negotiations leading to settlement of those claims.

Having been taken by surprise by the Chapter 11 filing and many having been twice burnt by Home Express, it is only natural that the debtors' suppliers were extremely reticent to sell their goods to the debtor on credit. After some hard bargaining, the debtor consented to give the vendors a subordinated lien on goods supplied postpetition.

Early in the case the usual squabbles broke out between the debtor and its prime lender, Bank of America. Efforts by the bank to assert a setoff against all of the company's available cash were met with a threatened lender liability suit. Within a very short time of filing, Bank of America's loan was taken out by a new lender, and a complete resolution of all differences between the parties followed in June of 1996.

Two other major disputes erupted in the early stages of the case. The first dispute involved taxes owed to various taxing authorities in several states. The issues were arcane and difficult, but by late 1996 almost all of them had been resolved consensually. The second dispute involved the debtor's rejection of its contract with its freight handler and other related issues. These matters were resolved at the May and June status conferences in this case.

The remainder of the disputes in this case involved assumption or rejection of leases and other executory contracts, employment of professionals, approval of compromises and other matters which typically arise in Chapter 11 cases of this magnitude. It is fair to say that most, if not all, of the legal issues in this case were either budding or in full bloom by July of 1996. Although the exact magnitude of the work that would be required to resolve those issues could not be predicted with pinpoint accuracy, it is also fair to say that professionals with the degree of experience in Chapter 11 cases that those in this case possess could give a reasonable estimate of what it would take to complete the case.

ditions after the conclusion of such employment, if such terms and conditions prove to

have been improvident in light of develop-

Shortly after their appointment,[2] counsel for the debtor-in-possession indicated that the key professionals intended to file an application to establish interim compensation procedures consistent with *In re Knudsen Corp.,* 84 B.R. 668 (9th Cir. BAP 1988). There, the court approved a payment procedure whereby the professionals were paid fees on a monthly basis by the debtor-in-possession, assuming the fees were acceptable. The professionals then filed and served upon all parties-in-interest fee applications at the end of each quarter. No additional fees were paid to the professionals until the quarterly statements were filed and approved by the court.

In response, I indicated that the whole business of setting fees in large cases pursuant to the lodestar hybrid incorporated into § 330, had become too burdensome for the court to administer without assistance and somewhat questionable in its efficacy. I proposed that the professionals either could agree to a flat rate for all of their services in this case, or pursuant to Federal Rule of Evidence 706 I intended to appoint my own expert to review the time sheets and otherwise assist me in the fee-setting process. If they chose the first option, then they were to file a breakdown of the time required for each category of services, a summary of the fees awarded in cases of comparable size in this district or others, and the total amount of fees they sought for the entire case. In response to their concerns about matters they could not reasonably anticipate arising and opponents who might try to take advantage of the limitations on their fees, I noted that most Chapter 11 cases are filled with surprises, both good and bad, and that they should build such contingencies into their flat fee. Should a truly remarkable event occur

in the course of the case, the reasonableness of the fee could be adjusted pursuant to § 328(a).

The professionals chose the flat fee option, and the subject was revisited at the April 19, 1996 status conference on this case. Although the parties had made some progress in formulating a flat fee proposal, their estimates only encompassed 120 days rather than the entire case. There was also uncertainty about whether a lender liability lawsuit would be filed against Bank of America, which obviously would have an impact upon the fee calculation. It was anticipated that the uncertainty regarding the Bank of America suit would be resolved in early May, and everyone agreed that the matter of flat fees should be continued until the end of May. The professionals also agreed that they would propose a flat fee based on the case lasting twelve months, and that the proposed fee would include all work necessary to fully administer the Chapter 11.

A more extensive hearing on this subject occurred on May 24, 1996. Although the professionals submitted more comprehensive analyses of their fee requirements (see Exhibit A, attached), the proposals extended only through confirmation. I made it clear that the flat fee had to be for the entire case. Otherwise, the professionals might realize a windfall by waiting until after confirmation to pursue claims objections and other matters. Thus, it was necessary to make upward adjustments in some of the proposed numbers to adequately provide for the services to be rendered. For example, an additional 200 hours were added to the estimates of both the debtor-in-possession and the committee counsel to cover claims litigation. I also

---

ments not capable of being anticipated at the time of the fixing of such terms and conditions.

**2.** The law firm of Gray, Cary, Ware & Freidenrich originally was appointed counsel for the debtor-in-possession but subsequently was disqualified. One of the firm's partners had served as assistant secretary to Home Express within two years prior to filing this case. I found that he was an "officer" for purposes of § 101(14)(D) of the Code, and that accordingly the firm as a whole failed to meet the "disinterested person" standard of the statute. Thereafter, the firm of Wright, Robinson, McCammon, Osthimer & Ta-

tum was appointed counsel for the debtor in possession, and Gray, Cary was appointed special counsel pursuant to § 327(e). Bankruptcy counsel from Wright, Robinson subsequently moved to the firm of Kaufman & Logan, and that firm thereafter became counsel for the debtor-in-possession. The Official Unsecured Creditors Committee is represented by Bronson, Bronson & McKinnon, and has as its accountant/financial advisor BDO Seidman LLP. Accounting services for the debtor-in-possession are provided by Deloitte & Touche LLP.

adjusted some of the numbers downward. The 200 hours reserved for work on employment applications seemed clearly excessive and were substantially reduced. The time allotted for preparation of fee applications was all but eliminated, since the only application contemplated would be for a final fee order at the end of the case allowing the amounts already paid. The proposed blended hourly rates were also reduced based upon my observations of what other professionals in the Bay Area charged in comparable cases. After making other adjustments, I set the following flat fees for the entire case:

| | |
|---|---|
| Wright, Robinson/Kaufman & Logan | $860,000 |
| Bronson, Bronson & McKinnon | $564,375 |
| Gray, Cary, Ware & Freidenrich | $215,000 |
| BDO Seidman | $300,000 |
| Deloitte & Touche | $150,000 |

Each of the firms were to receive a draw on these flat fees in the following amounts:

| | |
|---|---|
| Wright, Robinson/Kaufman & Logan | $75,000 per month |
| Bronson, Bronson & McKinnon | $45,000 per month |
| Gray, Cary Ware & Freidenrich | $20,000 per month |
| BDO Seidman | $30,000 per month |
| Deloitte & Touche | $20,000 per month |

These flat fees were subject to adjustment only upon a clear showing that they were "improvident in light of developments not capable of being anticipated" under § 328(a). The amounts allowed did not include expenses, which were to be monitored by the debtor's accounting staff pursuant to this court's published fee and expense guidelines.

After arriving at these numbers, I directed that the acting Chief Executive Officer of the company and the chairman of the creditor's committee submit sworn statements within thirty days either in support of the flat fees or in opposition to them, and that all creditors and parties in interest be given notice and an opportunity to object to the arrangement. Only two objections were filed in response to the notice, and neither objector (both of whom were *pro se*) appeared at the June 28, 1996 hearing. The U.S. Trustee filed a response to the motion, stating that she did not object to the flat fee arrangement, but wanted copies of the professionals' time sheets on a monthly basis to determine whether the fees received were justified by the hours spent. I directed the professionals to send the U.S. Trustee's office an invoice for the fees received each month and to send a copy of their time sheets each quarter, but made clear that the flat fees were subject to adjustment only pursuant to § 328(a), not under a lodestar analysis.

The flat fee arrangement was finally approved at the conclusion of the June 28 hearing, and an Order was entered on August 5, 1996 (See Exhibit B, attached).

■ The primary premise of the motion presently before the court is that the debtor's reorganization will take approximately twelve to fourteen months longer than originally anticipated, and that the reasons for this delay constitute "developments not capable of being anticipated" when the flat fees were proposed, thus requiring an adjustment under § 328(a) to cover the period from April 1, 1997 to the end of the case. The professionals first argue that they made their initial fee proposals in reliance on the "business plan" proposed by Mervyn Weich, the temporary crisis manager hired at or around the filing of the Chapter 11 petition in response to resignations *en masse* by the company's key officers. That "plan" called for the debtor to be out of Chapter 11 by the first quarter of 1997. Although such was Mr. Weich's stated intent, it is unclear whether it was a hope or a plan. In any event, at no time during the fee-setting hearings did the professionals assert that their fee estimates were totally dependent on the success of the Weich plan. Indeed, by the end of June, 1996, the hope of a one year turnaround could not seriously be entertained by anyone. Replacement management had not yet been found, no real business plan had been put into place, no efforts to market the business had been made, no potential buyers had emerged and serious financial losses continued unabated each month.

■ The professionals also assert that difficulties with the reclamation claimants and other trade creditors proved more nettlesome to resolve than could reasonably be anticipated. Although the reclamation and vendor lien issues were difficult and time-consuming, by May of 1996 the nature and tenor of these disputes was clearly apparent.

■ The only real surprise that might justify a fee adjustment for the professionals under § 328(a) centers on a pervasive managerial vacuum. Whether the blame for this vacuum should be laid at the feet of the company's board of directors or attributed to one or more of the four different sets of officers which have wandered through this company over the past two years is not clear. What is clear is that tens of thousands of dollars were paid to management while the company lost millions each month. Tens of thousands more were paid for a turnaround team to identify the company's problems and formulate a restructure plan, only to have that team abandon the company a few months later when the Christmas season didn't turn out as they had hoped, proclaiming on their way out the door that they don't do liquidations.

The departure of turnaround management resulted in the reinstallation of some of the same people who managed the company pre-petition. The company's fortunes have turned somewhat for the better. The number of stores in operation has been reduced to twelve, and two potential buyers are presently negotiating for the purchase of the chain.

Although bad management is too often the norm in Chapter 11 cases, it is unusual indeed for a company to have paid so much to so many for so little. The managerial vacuum not only left the professionals stranded in this case with no leadership or direction, but also required them to attempt to fill the void. Because this was a "development that was not capable of being anticipated at the time" their flat fees were set, I find that some adjustment in those fees is appropriate, although not entirely as requested.

■ Kaufman & Logan seeks approximately $200,000 in fees for the period from April 1, 1997 to September 30, 1997, with an additional adjustment to be made thereafter. A complete picture of how all of the $860,000 has been spent was not submitted, since the time spent by Wright, Robinson on various projects was not included. Kaufman & Logan's breakout reveals that the time spent on postpetition operations was more than double the budgeted amount. A review of the time

sheets indicates that some of that time could have been moved into the "case administration" category which was under budget. Some of the overrun was justified by the managerial vacuum discussed above. Some of it, however, was due to counsel's over-involvement in the business affairs of the debtor. Other problem areas include excessive amounts of time spent on relief from stay litigation (of which there was little) and on the vendor lien issue (which probably could have been delegated to Gray, Cary). In addition, there is some evidence that Kaufman & Logan has not staffed this case as efficiently as a flat fee arrangement would warrant. The minutes of the hearings in this case indicate that the firm has had two to three attorneys in attendance at each hearing, even though many of the matters on calender were unopposed.

Based upon a review of all of the evidence before me, I conclude that Kaufman & Logan should be given supplemental fees of $175,000, payable at $25,000 per month retroactive to April, 1997. I further find that this additional fee should be more than enough to complete this case. The main tasks remaining to be done are to negotiate a sale agreement, prepare a disclosure agreement and plan, and further find that this additional fee should be more than enough to complete this case. The main tasks remaining to be done are to negotiate a sale agreement, prepare a disclosure agreement and plan, and review claims. Depending upon how these tasks are approached, any one of them could exceed the supplemental fee amount, or they could all be performed for less than that amount, depending on the ingenuity of counsel. If sale negotiations become too tedious and time-consuming, perhaps the business could be auctioned off to the highest bidder as in previous Chapter 11 cases before this court. I have already indicated to counsel that since the plan will essentially effectuate a liquidation of the business, the disclosure statement should be bare bones instead of the usual impenetrable tome found in cases of this sort. Counsel for the creditors committee is already well-versed in handling large volumes of claims in other cases, and could offer assistance in establishing an efficient

system in this case. Because Gray, Cary is substantially under budget at this point, some of the work remaining to be done can be delegated to them. While coming in under budget may be difficult, I am convinced it can be accomplished. Although I am not precluding additional motions for adjustment under § 328, I cannot imagine any additional "developments not capable of being anticipated" at this late date in the case.

Gray, Cary seeks an additional $30,000 in fees above their original flat rate to complete this case. That request will be approved, with the understanding that the firm will take a more active role as special counsel going forward. The remainder of their fees may be paid at the rate of $10,000 per month retroactive to April, 1997, with that amount being raised to $20,000 per month effective October 1, 1997.

Bronson, Bronson & McKinnon seeks only $40,000 in fees above their original flat rate to complete this case. This firm is also substantially under budget at this point, but their request for a mere 7% increase will be approved as reasonable. Their monthly draw is hereby reduced to $20,000 per their agreement.

▮ BDO Seidman seeks an additional $195,000 for the period from April 1, 1997 to March 31, 1998. It is not entirely clear from their submissions why a 65% increase in their original flat rate is necessary. What is quite clear is that the first $300,000 was expended through the labors of no less than twenty-four people in their firm. The whole concept of a flat fee appears to have been ignored, since the firm went well over-budget through March 31, 1997. Because I am convinced that the original fee proposed by this firm was unrealistically low from the outset, and because the debtor retained no one to perform some of the tasks that BDO Seidman performed for everyone in the case, I will allow the $48,515 incurred above the flat fee through April 30, 1997, payable in two monthly installments. I will allow a maximum of an additional $50,000 to complete their services in this case, payable in the amount of $10,000 per month beginning October, 1997.

▮ Deloitte & Touche seeks an additional $128,000 above its flat rate, but has submitted absolutely nothing to support this request and did not appear at the June 11, 1997 hearing. Other parties informed me at that hearing that the bulk of the additional money requested is to perform an audit. When asked why an audit was necessary, I was told that the 45 equity security holders of the debtor required it. While an audit of the books of this company may serve some useful purpose for the equity security holders, it can serve no purpose to anyone else. To audit the books of a non-public company that is presently swimming in red ink is a waste of scarce resources. If the equity security holders wish to have an audit, they may have it, but I will not authorize the debtor to pay for it. The remainder of the requested fees presumably are for the preparation of 1996 corporate income taxes. If that is so, Deloitte & Touche is welcome to so inform me, but the debtor is not authorized to pay any additional fees to this firm except upon further order of the court.

When I offered an alternative means of arriving at a reasonable fee in this case, I fully expected some trial and error in what was and is, to my knowledge, a unique experiment and thorough departure from the usual hourly rate billing procedure utilized in large cases. As noted above, I am not prepared to preclude any additional adjustments to the flat rates initially proposed. But unless the professionals can present convincing evidence of encounters with truly unforeseeable developments, the fees as set forth in this order are intended to be final allowances. As such, the debtor is directed to give all parties-in-interest twenty days notice and opportunity to object to this order. A hearing will be set in early August if objections are filed. In the meantime, the debtor is authorized to make payments pursuant to the terms of this order.

IT IS SO ORDERED.

## EXHIBIT A
### HOME EXPRESS, INC.

AMENDED PROFESSIONAL FEE BUDGET THROUGH PLAN CONFIRMATION [1]

| | | Committee Hours | Debtor Hours | Special Counsel Hours [2] |
|---|---|---|---|---|
| 1. | Employment [3] | 70–85 | 120–140 | |
| | Negotiate, draft and file employment applications of various professionals Response and Appearance on Employment of Gray Cary Objections and responses to objections Prepare budget, amended budget and comparables | | | |
| | Draft application for employment and budget for counsel, Gray Care Ware & Freidenrich ("GCW & F") | | | 40–50 |
| 2. | Case Administration | 185–225 | 90–100 | |
| | Review and analysis of Schedules Create, revise and review Schedules and petition; compliance with regulatory authorities; compliance with U.S. Trustee requests and meetings 341 meeting(s) | | | |
| 3. | General Business Advice | 75–125 | 800–1000 | |
| | Initiate and respond to general business issues with creditors/management; Analysis of Debtor's business issues as relates to Bankruptcy Code; Attend weekly Home Express Executive staff meetings | | | |
| | General Business Advice, Corporate and Securities | | | 150–160 |
| | Tax [4] | | | 130–140 |
| | Erisa | | | 70–80 |
| | Trademark | | | 70–80 |
| | Intellectual Property | | | 70–80 |
| | Commercial (relating to Congress Financial loan documentation and administration) | | | 80–90 |
| 4. | Contested Matters | 200–250 | 400–600 | |
| | Analyze, respond and negotiate third party contested motions; consult with management and Committee regarding same; appear to Court regarding same | | | |
| 5. | Financial Filings | 50–75 | 90–110 | |
| | Review and advise operating reports Review of financial statements | | | |
| 6. | Operations | 250–325 | 200–250 | |
| | Asset Analysis Inventory Review Analysis of core business with regard to development of Business Plan | | | |
| 7. | Litigation [5][6] | 75–150 | 200–250 | 70–75 |
| | B of A Litigation Employment counseling and litigation | | | |
| 8. | Creditors and Creditor's Committee | 200–250 | 200–220 | 20–30 |

Meetings with Committee
Responding to Creditor Inquires
Meetings with Home Express
   regarding Committee requests for
   information

| | | | |
|---|---|---|---|
| 9. Financing | 35–50 | 10–20 | |
|   Cash Collateral<br>  DIP Financing | | | |
| 10. Executory Contracts [7] | 200–225 | 400–450 | 30–40 |
|   Real Property and Capital Equipment<br>    Lease Analysis, negotiation, draft<br>    and revise motions and hearings<br>  Other contracts, assumption and<br>    rejection, drafting and revisions to<br>    motions and hearings | | | |
| 11. Claims Administration [8] | 300–350 | 300–350 | 100–120 |
|   Reclamation Commercial analysis<br>  Review of demands<br>  Prepare requests for information<br>  Review responses<br>  Prepare objections to claims | | | |
| 12. Disclosure Statement and Plan | 150–200 | 200–275 | 100–120 |
|   Development, analysis and revision of<br>    Disclosure Statement and Reorgani-<br>    zation Plan | | | |
| 13. Confirmation | 10–20 | 30–40 | 5–10 |
|   Prepare for and attend confirmation<br>    hearing | | | |
| 14. Fee Application | 35–50 | 80–100 | 80–100 |
|   Prepare and review various fee<br>    applications | | | |
|     Total Hours = | 1835–2380 | 3280–4055 | 935–1085 |
|     Total Amounts = | $431,225–$559,300 [9] | 754,400–$932,650 [10] | $215,050–$249,550 [11] |

1. This budget runs from date of employment of the various professionals which will, of necessity, be different, (e.g.) Wright, Robinson's employment began March 11, 1996, whereas Committee Counsel began February 28, 1996. All numbers set forth herein are exclusive of allowable costs and expenses. Confirmation is projected to occur during the first quarter of 1997.

2. GCW & F began employment as special counsel on March 15, 1996. This budget is for all work done after that date as special counsel, as well as some transition work to the Wright Robinson firm and includes work on the fee application relating to the work done from February 6, 1996 through March 15, 1996 as interim Debtor's counsel. GCW & F was authorized by Order dated April 9, 1996 to render services as special counsel in the following areas: general corporate, tax, erisa, trademark, intellectual property, commercial (advice regarding Congress Financial documentation and commercial analysis of reclamation demands), employment counseling and employment litigation related thereto. Subsequent to the entry of that Order, the Debtor, Wright Robinson and GCW & F shifted the reclamation issues to the Wright Robinson firm for efficiency.

3. A substantial amount of time was spent by Committee counsel in response to the challenge to the employment of Gray Cary.

4. There was unexpected and substantial work in this category in the first 2 months of employment relating to sales tax issues. The hearing on that relevant motion has not yet occurred and it is unknown if additional assistance from GCW & F will be required.

5. Note, this estimate has been substantially revised downward to give effect to the pending settlement of the Bank of America litigation. Originally, Debtor's counsel estimated between 400–630 hours matching Bank of America's estimated budget.

6. This number does not include any post-confirmation avoidance recovery actions as the Committee and the Debtor have not yet discussed which party will be responsible for the filing of avoidance actions.

7. Early in the case and continuing through present, a significant dispute arose with one of the members of the Committee and the Debtor over the rejection of that creditors' contract. This matter is the subject of a contested matter in which the Committee was involved.

8. Early in the case the Debtor brought a motion for the payment of certain pre-petition tax obligations for sales taxes in a number of different states. The Committee opposed the motion and because the taxes related to a number of different states, it required extensive research and analysis. Further, it is difficult to accurately forecast a claims resolution number at this time as the Committee and the Debtor have not yet determined which party will be responsible for the resolution of claims.

9. For estimation purposes only, the Committee's budget is based upon a "blended" rate of $235 per hour.

10. Debtor's counsel, as set forth in its Application for Employment, bill at rates from $165/hour to $325/hour. For estimation purposes only a "blended" rate of $230/hour was used.

11. Special Counsel (GCW & F) has calculated its estimate based on past history (the pre-petition year of general corporate services without fees attributable to the failed IPO) and the anticipated fees associated with the specific tasks listed above contemplated through plan confirmation. For purposes of estimation only, GCW & F also has used a blended rate of $230/hour.

**Comparables**

For comparison purposes, this Debtor is a retailer with approximately $250 Mil in revenue projected to hit $285.0 million during the next 12 months, 3,000 employees doing business in 39 operating and under construction locations in 7 western states. Debtor is subject to approximately 100+ Reclamation Claims requesting 5.0 million, total assets, at market value, exceed $115.0 million at time of petition.

## COMPARABLES

|  | Debtor | Committee | Time Period | Comments |
|---|---|---|---|---|
| Media Vision | $1,185,000 | Unsecured: $143,708<br>Indenture: $111,6711 | July 94—Dec. 94 | $200 Mil revenue<br>1 location;<br>technology company |
| Everex | $1,418,000 | $493,964 | July 93—April 94 | $92 Mil assets<br>$300 Mil revenue; 1 location; technology company |
| Daisy Systems | $880,000 | $639,000 | July 90—March 95 | 100.0 Mil assets<br>$350 Mil revenue;<br>technology company;<br>2 locations; 1,100 employees |
| Liquor Barn | $515,000 | Unknown | Unknown | $20 mil assets;<br>liquidating Chapter 11; 10 stores, 100 employees; no reclamation claims |
| Home Express I | $328,079.45 (Fees)<br>$26,225.23 (Costs)<br>(Per final fee application of November 1990) | $140,000 | March 90—Sept 90 | Approx. $100.0 mil revenue; 12 stores at time of filing ultimately going to 5 stores; no reclamation claims |

THE PROFESSIONALS SUBMIT THIS BUDGET AS A "BEST ESTIMATE" OF WHAT WILL OCCUR WITHIN THE TIME PERIOD REFLECTED HEREIN. THE PROFESSIONALS WILL MONITOR, ON A MONTHLY BASIS, THE FEES EXPENSES INCURRED IN THIS MATTER. IF IT APPEARS THAT THE FEES IN ANY PARTICULAR CATEGORY SET FORTH ABOVE, FOR ANY OF THE PROFESSIONALS, WILL EXCEED THE BUDGETED AMOUNT BY 15% FOR THE PERIOD REFLECTED HEREIN, SUCH PROFESSIONALS(S), WILL AMEND ITS BUDGET IN WRITING, WITH NOTICE TO ALL INTERESTED PARTIES, AS DIRECTED BY THIS COURT.

---

**EXHIBIT B**

Garrett L. Cecchini (State Bar No. 96345)

Sandra L. Cross (State Bar No. 68795)

Gerald F. Ellersdorfer (State Bar No. 33804)

Rita M. Jennings (State Bar No. 165555)

Kaufman & Logan

111 Pine Street, Suite 1300

San Francisco, California 94111

Telephone: (415) 392–6677

Attorneys for Debtor
and Debtor-in-Possession
Home Express, Inc.

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

(Oakland Division)

In re HOME EXPRESS, INC., a Delaware Corporation, Debtor.

Chapter 11

Case No. 96–41046N

MC No. GLC–6

Tax I.D. No. 94–2986376

Aug. 5, 1996

**ORDER ON FLAT FEE PAYMENTS TO PROFESSIONALS**

This Court having considered the joint applications of Wright, Robinson, Osthimer &

Tatum by Garrett L. Cecchini, Esq. counsel for Home Express; Gray Cary Ware & Freidenrich by Lillian Stenfeldt, Esq. special counsel for Debtor; Bronson, Bronson & McKinnon by Stuart Koenig, Esq. counsel for the Official Unsecured Creditors' Committee, the above filed March 25, 1996 and attached hereto as Exhibit A; BDO Seidman accountants for the Official Unsecured Creditors' Committee and Deloitte & Touche accountants for Home Express, finds that:

1. Proper notice has been given to all creditors and to all parties on the "All Notices List" defined by the Order Establishing Case Management Procedures and Hearing Schedule dated March 15, 1996.

2. Notice of Court's Intention To Rule ("Notice") attached hereto as Exhibit B has, as directed by the Court, been timely served on all parties.

3. Pursuant to the above Notice, two creditors filed objections which objections have been overruled.

4. Pursuant to the above Notice, the U.S. Trustee filed certain comments which comments have been overruled.

The Court, further finding that the proposed fee payments in the amounts set forth in Exhibit B, are in the best interests of the Estate and its creditors and that good cause exists, it is

ORDERED; that the professional fee payments in the amounts set forth herein below, are approved for each professional commencing with each professional's court approved application for employment.

| Professional | Entire Case Fee | Monthly Amount |
|---|---|---|
| 1. Wright, Robinson, Osthimer & Tatum; (Debtor's Counsel) | $860.000 | $75,000 |
| 2. Gray Cary Ware & Freidenrich; (Special Counsel to Debtors) | $215,000 | $20,000 |
| 3. Bronson, Bronson & McKinnon; (Committee Counsel) | $564,375 | $45,000 |
| 4. DeLoitte & Touche; (Debtor's Accountants) | $150,000 | $12,000 |
| 5. DBO–Seidman; (Creditors' Committee Accountants) | $300,000 | $30,000 |

Gray Cary Ware & Freidenrich holds a pre-petition retainer of $250,000 for services rendered prior to March 15, 1996, for which it must file a fee application. If there is a balance remaining, Gray Cary Ware & Freidenrich has authority to apply the balance as a credit toward payment of services rendered subsequent to March 15, 1996, pursuant to this Court's order regarding same.

FURTHER ORDERED; the above fees are exclusive of costs which shall be monitored by Home Express and paid in accordance with the Northern California United States Trustee's guidelines.

FURTHER ORDERED; that all professionals subject to this order, shall only file final fee applications at the conclusion of the case.

FURTHER ORDERED; that professionals may petition the court for fees in excess of those maximum fees set forth on Exhibit B, however, additional fees shall be granted if and only if evidence is presented clearly showing that any excess fees are required by an unforeseeable event and,

FURTHER ORDERED; that each professional subject to this order shall submit copies of monthly invoices to Home Express

as a pre-condition of payment with duplicate copies sent to the U.S. Trustee's Office.

Dated:

RANDALL J. NEWSOME

HONORABLE RANDALL NEWSOME
    UNITED STATES
    BANKRUPTCY JUDGE

APPROVED AS TO FORM AND CONTENT:

BRONSON, BRONSON & McKINNON

By /s/ Stuart I. Koenig

    Stuart I. Koenig, Counsel for
    Unsecured Creditors' Committee

GRAY CARY WARE & FREIDENRICH

By /s/ Lillian Stenfeldt

    Lillian Stenfeldt Special Counsel
    for Home Express

BDO–SEIDMAN, LLC

By /s/ Jack Weisbaum
    Jack Weisbaum

APPROVED AS TO FORM AND CONTENT:

DELOITTE & TOUCHE

By /s/ H. Richard Fiedelman
    Rick Fiedelman by Donna Lamson