In re NUCENTRIX BROADBAND NET-
WORKS, INC., a/k/a Heartland Wire-
less Communications, Inc., et al.,
Debtors.

No. 03–39123HDH–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 20, 2004.

Josiah M. Daniel, III, Vinson & Elkins, Dallas, TX, for Debtor.

George F. McElreath, Office of the U.S. Trustee, Dallas, TX, for United States Trustee.

*MEMORANDUM OPINION ON FINAL FEE APPLICATIONS OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. AND VINSON & ELKINS, L.L.P.*

HARLIN D. HALE, Bankruptcy Judge.

This opinion addresses the issue of the authority of a bankruptcy court to award enhanced compensation to two sets of professionals employed by the Debtor: (1) Counsel for the Debtor in Possession, Vinson & Elkins, L.L.P. ("V & E"), employed pursuant to Bankruptcy Code Section 327; and (2) Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"), employed as financial advisors and investment bankers, pursuant to Bankruptcy Code Section 328. Because of the interplay between these two Bankruptcy Code provisions governing the employment of professionals, and given the importance of the issue to professionals employed in bankruptcy cases, the Court issues this written opinion.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the Standing Order of Reference in this District. The consideration of these applications by the Court is a core proceeding, pursuant to 28 U.S.C. § 157(A), (B), and (O).

### Case History

Nucentrix Broadband Networks, Inc. and certain subsidiaries (collectively, "Debtors" or "Nucentrix"), filed voluntary bankruptcy petitions in this Court on September 5, 2003.

Before the cases were filed, Nucentrix held the rights to certain frequencies of radio spectrum licenses by the Federal Communications Commission ("FCC") covering over eight million households in over ninety primarily medium and small markets across Texas, Oklahoma, and the Midwest, and other licenses for spectrum covering over two million households, primarily in Texas.

The Debtors initially attempted to use their spectrum to provide wireless subscription television services, often referred to as "wireless cable," but were unsuccessful. The Debtors subsequently attempted to shift the use of their spectrum from wireless cable to broadband internet and other advanced wireless services, but were also unsuccessful due to the combination of years of regulatory proceedings, delayed technology product cycles and a restricted capital market. These missteps led Nucentrix first to seek new investment or a buyer, and later, the protection of Chapter 11. The Debtors' stated goal from the outset was to maximize the value of the Debtors' assets for the benefit of their creditors and equity through the sale process provided by Bankruptcy Code Section 363, and then through the plan process.

The Debtors retained V & E, their prepetition attorneys, to serve as general bankruptcy counsel, pursuant to Bankruptcy Code Section 327. The Debtors hired Houlihan to serve as financial advisors and investment bankers. Importantly, for this opinion, the employment order for Houlihan provides that the final fee application of Houlihan would be subject to the standards set forth in Section 328(a) of the Bankruptcy Code, which allow for approval of a compensation arrangement in advance. Pursuant to that provision of the Code, this Court approved a fee for Houlihan in the aggregate amount of $800,000.

At the time of the filing, the Debtors had one potential bidder, SBC Communications, Inc. ("SBC") and cash to fund operations for about sixty days. On the petition date, the Debtors also entered into an asset purchase agreement with SBC Operations, Inc., as a stalking horse bidder, for a total cash purchase price of $15 million. Under the proposed transaction with SBC, creditors were expected to receive approximately twelve cents on the dollar.

On the Debtors' motion, the Court approved a sale process which provided procedures designed by Houlihan and V & E for competing offers for the purchase of the Debtor's assets. The process included a competitive auction in early November 2003.

Under the Court-approved sale process, the Debtors received several qualified bids to purchase the assets, which then required the Debtors to hold a competitive auction presided over by V & E and Houlihan. The auction started on November 4, 2003, and concluded late in the day on November 5, 2003, and was very successful. Nextel Spectrum Acquisition Corp. and Unrestricted Subsidiary Funding Company (collectively "Nextel") won the auction with a bid of $51 million in cash, plus assumption of certain liabilities estimated at approximately $5 million. Nextel

also agreed to provide the Debtors with Debtor in Possession financing in an amount sufficient to last through the approval process with the FCC. The Court approved the transactions with Nextel in late November 2003. Houlihan and V & E continued their labors for the Debtors after the approval of the Nextel sale, handling at least four sales of residual assets.

The Debtors proposed and confirmed a plan in the Spring of 2004, which incorporated the Nextel sale transaction. The FCC approved the sale to Nextel, the Debtors closed the transaction, and the effective date under the plan has occurred.

As a result of the sale process and the efforts of V & E and Houlihan, all of the Debtors' creditors are projected to be paid in full and a substantial return is projected to be made to equity security holders. By any measuring stick, this bankruptcy case was an extraordinary success.

### A. The application of Vinson and Elkins.

V & E served as general bankruptcy counsel to the Debtors. During the pendency of the case, V & E provided services to the Debtors in bankruptcy, corporate, securities, tax and litigation matters. Under an agreement with the Debtors, V & E agreed to reduce its rates to 93% of its standard rates. In addition, because of the dire circumstances the Debtors were experiencing at the time the case was filed, V & E received only a $47, 000 retainer.

During the course of this complicated bankruptcy case, V & E has provided exceptional legal representation and advice to the Debtors. V & E prepared and effectuated the sale process, which led to the Debtors' receiving a bid over three times the original stalking horse bid. The case presented a host of regulatory, securities, and other issues, which were managed and handled by V & E. Much of the work

by the law firm was out of court, as the fee application demonstrates. However, the sale hearings, lease disputes, disclosure statement, plan, and post plan disputes have been before the Court and V & E has done exemplary work in all respects.

In its fee application, V & E seeks an upward adjustment from its discounted rates to its standard hourly rates charged in other bankruptcy cases, as well as an enhancement for the results obtained.

 To determine reasonable compensation, the court must determine the "nature and extent of the services supplied by" the attorneys. 11 U.S.C. § 330(a)(3); *In re First Colonial Corp.*, 544 F.2d 1291, 1299 (5th Cir.1977). The court must also assess the value of those services in relation to the customary fee and the quality of the work. These two factors comprise the components for the lodestar calculation. *See Cobb v. Miller*, 818 F.2d 1227, 1231 (5th Cir.1987). Generally, the lodestar is calculated by multiplying the number of hours reasonably expended by reasonable hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The court may then adjust the compensation based on the factors of § 330(a)(3) and (4) and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The *Johnson* factors may be relevant for adjusting the lodestar calculation but no one factor can substitute for the lodestar. *Id.* Rather, the lodestar shall be presumed to establish a reasonable fee with adjustments made when required by specific evidence. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986); *Graves v. Barnes*, 700 F.2d 220, 222 (5th Cir.1983) (adopting "lodestar" method of calculation, citing

*Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1092–93 (5th Cir.1982)).

### Case Law and Commentary on Fee Enhancements

■ According to commentators, a professional may petition a bankruptcy court for a fee enhancement or bonus if a professional's work has been of superior quality. In order to receive a fee enhancement, the professional typically must establish that "the quality of service rendered was superior to that which one should reasonably expect in light of the hourly rates charged and that success was 'exceptional.'" *See* William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRAC.2d § 26.7 (2004).

Bankruptcy courts in his circuit have recognized the need for an adjustment to a fee for extraordinary circumstances when the lodestar analysis simply will not fairly compensate the professional, given all the surrounding circumstances. *See, In re El Paso Refinery, L.P.,* 257 B.R. 809, 826 (Bankr.W.D.Tex.2000). The Fifth Circuit has found that upward adjustments of the lodestar are permissible, but are reserved for those few cases which are "rare and exceptional." *Transamerican Natural Gas Corp. v. Zapata P'ship, Ltd.,* 12 F.3d 480, 488 (5th Cir.1994); *Lawler v. Teofan (In re Lawler),* 807 F.2d 1207, 1213–14 (5th Cir.1987).

Bankruptcy courts in the Fifth Circuit have occasionally determined a Chapter 11 case to meet the criteria for the award of a fee enhancement to estate-paid professionals. For example, in *In re Farah,* 141 B.R. 920 (Bankr.W.D.Tex.1992), the court provided a substantial enhancement for Debtor's counsel in a case which was turned from a case of an expected 5% return to unsecured creditors to a case in which creditors received payment in full with interest and the Debtors were able, to retain assets worth in excess of $3.5 million, largely because of the efforts of Debtor's counsel. According to the *Farah* court, the result was "rare and exceptional" because the results exceeded the reasonable expectations of the parties under the Bankruptcy Code. *Id.* at 925.

In *In re Intelogic Trace, Inc.,* 188 B.R. 557 (Bankr.W.D.Tex.1995), the Court awarded a 1% enhancement as a success fee to a consultant for the consultant's efforts in selling properties and obtaining a return far beyond the original expectations.

Finally, in an unpublished ruling this court previously awarded an enhancement of approximately 10% above the hourly calculations to Debtor's counsel in a Chapter 11 case where creditors were paid in full and shareholders retained significant value. *In re I.C.H. Corp.,* Case No. 395–36351 RCM–11(Bankr.N.D.Tex., June 20, 1997).

■ Determining what constitutes reasonable compensation is soundly within the discretion of the bankruptcy court, because the bankruptcy judge is in the best position to determine the reasonableness of a proposed fee. *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983), *see also In re Anderson,* 936 F.2d 199, 204 (5th Cir.1991). In determining whether the circumstances of a case are so "exceptional and rare" as to warrant a fee enhancement, the "results obtained" factor in the lodestar analysis is one of the more significant factors. *See, In re Farah,* 141 B.R. 920, 925 (Bankr. W.D.Tex.1992). *See also, Rose Pass Mines Inc. v. Howard,* 615 F.2d 1088, 1090 (5th Cir.1980). In fact, at least two bankruptcy courts have required that all creditors of the estate be paid in full before allowing a fee enhancement. *See, In re Morris Plan Co. of Iowa,* 100 B.R. 451, 454 (Bankr.N.D.Iowa 1989); *In re D.W.G.K.*

*Restaurants,* 106 B.R. 194, 197 (Bankr. S.D.Cal.1989).

■ Applying this case law and commentary to the instant case easily leads to the conclusion that this case is rare and exceptional. At the time of the case filing, the Debtors' financial condition, to be charitable, was fragile. The Debtors' out of court solutions had failed. The Debtors were virtually out of cash. The Debtors appeared to have only one option, a quick sale to SBC. The Debtors entered bankruptcy with their viability wholly dependant upon post-petition financing during the process. Debtors' counsel, with the help of Houlihan, was able to navigate these Debtors through a sale and plan process which resulted in the proceedings going from a small dividend to unsecured creditors to a 100% payout, plus a substantial return to shareholders. Counsel successfully represented Debtors' interests at each step of the way, even including an attempt by one creditor to set aside the confirmed plan, which would have jeopardized the recovery for the unsecured creditors.

Because of the expeditious sale process, devised and handled largely by V & E, the creditors are now being paid in full and shareholders will receive a substantial return. But for the extraordinary efforts of Debtors' counsel and Houlihan, these results would not have occurred.

Under the circumstances, the Court believes that, under the lodestar approach, a fee based upon the normal hourly rates charged by the law firm (instead of the discounted 93% rates), multiplied by the number of hours billed, is reasonable. The Court further finds that an enhancement of 10% of that amount appropriately recognizes the contribution of counsel to the success of this case due to the rare and exceptional nature of this case, but remains true to the public's interest in dis-

couraging professionals from excessive charges. The Court allows all expenses requested as reasonable.

### B. The application of Houlihan Lokey Howard & Zukin Capital, Inc.

The Debtors engaged Houlihan to serve as financial advisors and investment bankers. Houlihan's engagement was under both Bankruptcy Code Sections 327 and 328.

In its application, Houlihan seeks not only the total $800,000 fee contracted with the Debtor and approved by the Court at the time of the employment, but also a bonus of $1,295,000.

As mentioned, unlike the Debtors' counsel, Houlihan's employment order provides that Section 328 of the Bankruptcy Code will provide the standard for review.

### Section 328

■ Section 328 allows a professional seeking to represent a bankruptcy estate to obtain prior court approval of his compensation plan. *See,* 11 U.S.C. § 328(a). Under that provision, the professional may avoid uncertainty by obtaining court approval of compensation agreed to with the estate. *See, In re Nat'l Gypsum Co.* 123 F.3d 861, 862–63 (5th Cir.1997). Under Section 328, once a compensation plan has received bankruptcy court approval, "the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments *not capable of being anticipated at the time of the fixing of such terms and conditions.*" 11 U.S.C. § 328(a) (emphasis added).

It is not enough that developments in a bankruptcy case be unforeseen. *Daniels v. Barron (In re Barron),* 225 F.3d 583,

585 (5th Cir.2000). Rather, the bankruptcy court is charged to follow the plain meaning of the statute, which requires the developments to be incapable of being anticipated to depart from the previously approved compensation scheme. *Id.*

Thus, on more than one occasion the Fifth Circuit has found reversible error when a bankruptcy court has deviated from a previously approved Section 328 payment arrangement based on developments which did not meet the express requirements of that statute. In *In re Barron*, the Fifth Circuit twice reversed a very respected bankruptcy judge for altering a Section 328–approved payment scheme based upon only "developments unforseen when originally approved." And, the appeals court has found that respected judges in this District have incorrectly applied Section 328. *See, National Gypsum*, 123 F.3d 861; *In re Texas Sec., Inc.*, 218 F.3d 443 (5th Cir.2000).

■ In the present case, Houlihan had its fees of $800,000 approved by this Court at the time of its engagement. It now seeks to have this approved arrangement altered and a bonus awarded because of the extraordinary result.

Houlihan did play a significant role in the success of this bankruptcy case. Its members worked long and hard through the sale process, which was extraordinarily successful. Houlihan continued to labor for the Debtors after the sale and the assignment of certain agreements and the assumption of certain liabilities.

Houlihan's position in its application, in the hearing on the application, and in post-hearing authorities, is that the extraordinary results from the auction and the full payment of creditors and return to shareholders were not reasonably expected and justify an upward departure from the previously approved Section 328 arrangement. With all due respect, the Court disagrees.

Early in this case, Debtors sought to sell their assets under a sale process developed by V & E and Houlihan. That process contemplated a stalking horse bidder at a competitive auction. The sale auction sought higher and better offers. While no party, even including this Court, expected that the auction process would be so successful, the success of the auction was capable of being anticipated. In fact, a successful auction was exactly what the parties anticipated.

The magnitude of success in the auction process likely was unforeseen when Houlihan sought the protection of its requested fee under Section 328. However, the possibility of an increased bid was certainly capable of being anticipated. Thus, the requirements to alter the Section 328–approved fee of Houlihan have not been met.

### Does Section 330 Help?

As an alternative, Houlihan seeks the bonus under Section 330 of the Code for the sale of certain residual assets, which occurred after the auction. Houlihan argues that the bonus it seeks should be awarded because Houlihan provided additional services, selling residual assets in four additional transactions.

■ The Court wishes it were so. However, the Engagement Letter (Dkt. Entry 20, Appl. to Employ, Ex. B) approved by this Court provides for the employment of Houlihan for the sale of all or substantially all of the assets of the Debtors in one or more transactions. Thus, the Engagement Letter approved by the Court is the compensation arrangement approved under, and governed by Bankruptcy Code § 328.

This ruling is reluctantly made as to Houlihan, because its professionals ably served the Debtors and the interests of creditors and shareholders. However, if a

firm obtains the protection of Section 328, the firm and the Court must live with the conditions of that section. While the Court is not particularly happy with this result, it cannot wink at the language of Section 328, nor the mandate of the Fifth Circuit and the United States Supreme Court to follow the language of the statute. If results would dictate changing the terms, a Court would be empowered to reduce the fees of a professional in an unsuccessful sale or case, and Section 328 is expressly written to preclude such action.

Although the Court is convinced of the worth of Houlihan to this case, such arguments do not allow for a departure from the previously approved compensation scheme. As taught by the Fifth Circuit, the bankruptcy court must honor the plain meaning of Section 328. The successful auction process was not only capable of being anticipated, it was the hope and desire of the professionals for the Debtor.

Accordingly, Houlihan is awarded its fees and expenses as provided in the Engagement Letter with the Debtors. However, the request for a bonus is denied.

The Court will prepare and enter orders on the applications.

### ORDER ON FINAL FEE APPLICATIONS OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. AND VINSON & ELKINS, L.L.P.

Came before the Court for hearing the Final Application of Houlihan Lockey Howard & Zukin Capital and the Final Application of Vinson & Elkins, LLP. (the "Applications"). For the reasons stated in this Court's Memorandum Opinion on the Applications, it is

**ORDERED** that Houlihan Lockey Howard & Zukin Capital is awarded $800,000.00 in fees and $26,272.00 in expenses, for a total of $826,272.00, less amounts previously received; it is further

**ORDERED** that Vinson & Elkins, LLP is awarded $1,322,820.30 in fees and $121,575.77 in expenses, for a total of $1,444,396.07, less their applied retainer and amounts previously received; and it is further

**ORDERED** that all other relief requested in the Applications is DENIED.