# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
December 11, 2012

Lyle W. Cayce
Clerk

No. 11-41010

In the Matter of: ASARCO, L.L.C.,

Debtors,

ASARCO, L.L.C.; ASARCO INCORPORATED; AMERICAS MINING CORPORATION,

Appellants Cross-Appellees,

v.

BARCLAYS CAPITAL, INCORPORATED,

Appellee Cross-Appellant.

Appeals from the United States District Court for the
Southern District of Texas

Before WIENER, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

In this fee dispute, we are asked to determine whether the bankruptcy court erred in: (1) awarding a $975,000 fee enhancement to Barclays Capital, Inc. ("Barclays") pursuant to 11 U.S.C. § 328(a); and (2) denying Barclays's request for a $2 million "success fee" based on the successful outcome of ASARCO, L.L.C.'s Chapter 11 bankruptcy proceeding. For the following reasons, we REVERSE the $975,000 fee enhancement and REMAND to the district court for further proceedings consistent with this opinion.

No. 11-41010

I.

In August 2005, ASARCO, a mining company based in the United States and owned by Grupo Mexico S.A.B. de C.V., filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Texas. ASARCO's bankruptcy filing was precipitated by "a mounting labor crisis, billions of dollars in environmental and asbestos liability, and a decline in copper prices . . . ." *ASARCO LLC v. Barclays Capital Inc. (In re ASARCO LLC)*, 457 B.R. 575, 578 (S.D. Tex. 2011) (*ASARCO II*).

Shortly after the petition date, ASARCO filed an application to retain Lehman Brothers ("Lehman") as its financial advisor and investment banker during the course of the bankruptcy proceeding. In October 2005, the bankruptcy court approved ASARCO's application to retain Lehman pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code. *See* 11 U.S.C. §§ 327(a) and 328(a).

ASARCO's engagement letter with Lehman ("Engagement Letter") provided that Lehman would perform the following services:

> a. Advise and assist [ASARCO] in formulating a plan of reorganization and/or analyzing any proposed plan, including assisting in the plan negotiation and confirmation process of a Restructuring Transaction under Chapter 11 of the Bankruptcy Code;
>
> b. In connection therewith, provide financial advice and assistance to [ASARCO] in structuring any new securities to be issued in a Restructuring Transaction;
>
> c. Participate in negotiations among [ASARCO] and its creditors, unions, suppliers, lessors and other interested parties relating to the Chapter 11 Case;
>
> d. Participate in hearings before the bankruptcy court with respect to the matters upon which Lehman Brothers has provided advice,

2

No. 11-41010

including, as relevant, coordinating with [ASARCO's] counsel with respect to testimony in connection therewith;

e. Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services;

f. Upon request, review and analyze any proposals [ASARCO] receives from third parties in connection with a Transaction, including, without limitation, any proposals for debtor-in-possession ("DIP") financing and/or exit financing;

g. Assist [ASARCO] in connection with [ASARCO's] liquidity analysis;

h. Review and analyze [ASARCO's] business, operations, properties, financial condition and prospects and financial projections (including business plans provided by [ASARCO]);

i. Evaluate [ASARCO's] debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for [ASARCO];

j. Analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by any Transaction;

k. Provide strategic advice with regard to restructuring or refinancing [ASARCO's] financial obligations;

l. Assist in the drafting, preparation and distribution of selected information and other related documentation describing [ASARCO] and the terms of a potential transaction;

m. Assist [ASARCO] in identifying, contacting and evaluating potential purchasers for any Sale Transaction; and

n. Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring Transaction or a Sale Transaction, as requested.

No. 11-41010

*ASARCO II*, 457 B.R. at 578–79. The Engagement Letter also listed services that were outside the scope of Lehman's engagement, including "accounting, audit, crisis management, or business consulting services," and "designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or any advice or opinions with respect to solvency in connection with any transaction." *Id.* at 579 (internal quotation marks omitted).

As compensation for the aforementioned services, ASARCO agreed to pay Lehman a $100,000 monthly advisory fee for the first 24 months of service and $75,000 per month thereafter until the end of Lehman's engagement. ASARCO also agreed to pay Lehman a $4 million transaction fee; however, 100% of the advisory fees paid during the first 24 months and 50% of the advisory fees paid thereafter would be credited towards the $4 million transaction fee.

In August 2007, and again in January 2008, ASARCO applied to the bankruptcy court for permission to expand the scope of Lehman's engagement and augment Lehman's compensation package. ASARCO stated that it had originally anticipated that Lehman's role in the bankruptcy proceeding would be limited and thus had negotiated the Engagement Letter with that limited role in mind. After Lehman was retained, however, ASARCO regularly asked Lehman to undertake additional (and, at times, critical) responsibilities that fell outside the scope of the Engagement Letter. ASARCO wanted to compensate Lehman for these additional services and to redefine the terms governing its retention of Lehman for the remaining months of its engagement. With regard to compensation, ASARCO sought to increase Lehman's monthly advisory fee retroactively to $150,000 for the period between April 2007 and September 2008. In addition, Lehman asked the bankruptcy court for authority to apply for "an additional discretionary fee based [on] the successful outcome" of ASARCO's bankruptcy. In its January 2008 application, ASARCO also requested

No. 11-41010

permission to pay Lehman a total of $1 million for specified services that it would render in connection with three pending fraudulent-transfer proceedings.

In May 2008, the bankruptcy court approved ASARCO's request to pay Lehman $1 million for services related to the fraudulent-transfer proceedings, but it declined to approve any of the other proposed revisions to the Engagement Letter. *See In re ASARCO LLC*, 2010 WL 4976937, at *3 (Bankr. S.D. Tex. Dec. 2, 2010) (*ASARCO I*). According to the bankruptcy court:

> Lehman was bound by the terms of its original engagement but could, under § 328(a), apply for additional compensation after the conclusion of its employment if it could prove that its original terms and conditions were "improvident in light of developments not capable of being anticipated at the time of fixing of such terms and conditions."

*Id.* (quoting 11 U.S.C. § 328(a)).

Less than four months later, in September 2008, Lehman's parent company, Lehman Brothers Holdings Inc., filed its own Chapter 11 bankruptcy petition, commencing the largest bankruptcy proceeding in United States history. And, a week after that, Barclays acquired Lehman's investment banking and financial advisory businesses.[1]

Barclays informed ASARCO that it was not willing to proceed under the terms of the Engagement Letter. ASARCO subsequently agreed to increase Barclays's compensation and, in late November 2008, the bankruptcy court approved the revised terms of Barclays's engagement[2] ("Revised Engagement

---

[1] For the sake of clarity, we will refer to Lehman as Barclays for the remainder of this opinion, even when discussing events that preceded Barclays's acquisition of Lehman.

[2] ASARCO and Barclays contemplated that the same team of investment bankers and financial advisors that previously assisted ASARCO under the banner of Lehman would continue to serve ASARCO as newly-minted members of Barclays.

No. 11-41010

Letter") in accordance with §§ 327(a) and 328(a) of the Bankruptcy Code.[3]  The Revised Engagement Letter provided that Barclays would receive a monthly advisory fee of $225,000 and a transaction fee of $5 million.  Unlike the original Engagement Letter, the Revised Engagement Letter specified that ASARCO's monthly advisory fee payments would not be credited towards the $5 million transaction fee.  In addition, the Revised Engagement Letter authorized Barclays to seek a "discretionary fee based upon the successful outcome of the case."  Barclays then proceeded to provide its services to ASARCO up to the point of plan confirmation.

In November 2009, the bankruptcy court approved the bankruptcy plan that was presented by Grupo Mexico, which provided for: (1) a 100% return to all of ASARCO's creditors; and (2) Grupo Mexico's reacquisition of ASARCO. The confirmed plan "result[ed] in one of the most successful bankruptcies in the United States in history."  *ASARCO II*, 457 B.R. at 580.  The bankruptcy court praised Barclays for helping to make this outcome possible, remarking that "[d]uring its more than four years of intensive service Lehman and then Bar[clays] played a critical role in achieving the successful reorganization of [ASARCO]."  *ASARCO I*, 2010 WL 4976937, at *13.

After the plan's confirmation, Barclays submitted a final fee application requesting, *inter alia*, (1) $1,202,500 for "unanticipated services"; (2) a $2 million success fee ("Success Fee") based on the overall outcome of ASARCO's reorganization; and (3) a $6 million auction fee ("Auction Fee") for Barclays's assistance in marketing and auctioning one of the bankruptcy estate's largest

---

[3] The bankruptcy court's order stated, in pertinent part, that "fee applications filed by [Barclays] shall be subject to review pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code and not subject to the standard of review set forth in Section 330 of the Bankruptcy Code."

No. 11-41010

assets.[4]  In December 2010, the bankruptcy court ruled that Barclays could recover an additional $975,000 for the "unanticipated services" pursuant to § 328(a) of the Bankruptcy Code.  *Id.* at *8.  The bankruptcy court denied Barclays's request for the Success Fee and the Auction Fee.  *Id.* at *13.

The reorganized ASARCO appealed the bankruptcy court's award of $975,000 to Barclays, and Barclays appealed the bankruptcy court's denial of the Success Fee and Auction Fee.  *ASARCO II*, 457 B.R. at 577–78.  The district court affirmed all of the bankruptcy court's decisions.  *Id.* at 594.

This appeal followed, in which ASARCO challenges the $975,000 fee award and Barclays contests the denial of its request for a $2 million success fee.  Barclays has not challenged the denial of its request for a $6 million Auction Fee.

## II.

In reviewing the rulings of the bankruptcy court, this court applies the same standards of review as applied by the district court.  *In re Scopac*, 624 F.3d 274, 279–80 (5th Cir. 2010).  We review the award of attorneys' fees for abuse of discretion.  *In re Barron*, 225 F.3d 583, 585 (5th Cir. 2000) (*Barron I*); *see also In re Pilgrim's Pride Corp.*, 690 F.3d 650, 657–61 (5th Cir. 2012).  In conducting this review, we analyze the legal conclusions that guided the awarding court's determinations de novo and that court's findings of fact for clear error.  *In re Coho Energy Inc.*, 395 F.3d 198, 204 (5th Cir. 2004); *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1252 (5th Cir. 1986).  We also review mixed questions of law and fact de novo.  *In re Quinlivan*, 434 F.3d 314, 318 (5th Cir. 2005).

---

[4] The request for the Auction Fee was premised on a supplemental engagement letter that Barclays entered into with ASARCO.  The bankruptcy court had never approved this supplemental engagement letter.

No. 11-41010

### III.

The first issue we consider is whether the bankruptcy court erred in awarding $975,000 to Barclays pursuant to § 328(a) of the Bankruptcy Code. ASARCO contends that the court erred in so doing because the subsequent developments giving rise to the additional services provided by Barclays were not "incapable of anticipation," which is a necessary prerequisite under § 328(a) for increasing such fees. Barclays counters that it provided numerous services that were both outside of the scope of the Revised Engagement Letter and "not capable of being anticipated" at the time the bankruptcy court approved Barclays's retention, justifying the $975,000 fee enhancement. As set forth below, we agree with ASARCO that the bankruptcy court erred in awarding the $975,000 fee enhancement.

### A.

Before delving into the merits of this case, we deem it useful to consult § 328(a) of the Bankruptcy Code and our relevant case law interpreting it. Section 328(a) provides that:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been *improvident in light of developments not capable of being anticipated* at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a) (emphasis added).

We have repeatedly interpreted § 328(a) as meaning precisely what it says: A professional may be retained on any reasonable terms; but, once those terms

have been approved pursuant to § 328(a), the court may not stray from them at the end of the engagement unless developments subsequent to the original approval that were incapable of being anticipated render the terms improvident. *See Coho Energy*, 395 F.3d at 204–05; *In re Barron*, 325 F.3d 690, 693 (5th Cir. 2003) (*Barron II*); *Barron I*, 225 F.3d at 586 (admonishing the bankruptcy court for failing to rely "upon the plain language of" § 328(a)); *see also In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 580 (Bankr. N.D. Tex. 2004) ("As taught by the Fifth Circuit, the bankruptcy court must honor the plain meaning of Section 328."). Section 328(a) therefore creates a "high hurdle" for a movant seeking to revise the terms governing a professional's compensation *ex post facto*. *In re Smart World Techs., LLC*, 552 F.3d 228, 234–35 (2d Cir. 2009) ("Surprisingly few cases have construed [§ 328(a)'s] language, but those that have make it evident that it is a high hurdle to clear."); *see also Coho Energy*, 395 F.3d at 205 (commenting that § 328(a) sets a "high standard"). Such a movant must show not merely that a compensation adjustment is appropriate in light of subsequent developments that were previously unforeseen or unanticipated by the parties; instead, the movant is tasked with the weightier burden of proving that the subsequent developments were incapable of being anticipated at the time the engagement was approved. *See Barron II*, 325 F.3d at 693 ("[T]he intervening circumstances must have been *incapable* of anticipation, not merely unanticipated."); *Barron I*, 225 F.3d at 586 ("It is not enough that the developments were simply unforeseen."); *Smart World*, 552 F.3d at 235 ("[S]imply because the size and scope of a settlement had not actually been anticipated, it does not follow that it was *incapable of anticipation*."). Likewise, before a court may revise a compensation agreement, it must explain with specificity why the subsequent developments were "incapable of being foreseen." *Barron II*, 325 F.3d at 693; *see also* 3 Collier on Bankruptcy § 328.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) ("A failure by the bankruptcy court

to make a record establishing that the approval was improvident and *setting out with specificity (not conclusory statements)* the development that could not have been anticipated at the time of approval will be insufficient to comply with the requirements of section 328.") (emphasis added); *cf. In re Evangeline Ref. Co.*, 890 F.2d 1312, 1327–28 (5th Cir. 1989) ("If a court awards fees but fails to explain why compensation was awarded at the level it was given, it is difficult, if not impossible, for an appellate court to engage in meaningful review of a fee award.").

Section 328(a)'s establishment of such a "high hurdle" was no accident. Congress enacted § 328(a) to eliminate the previous uncertainty associated with professional compensation in bankruptcy proceedings, even at the risk of potentially underpaying, or, conversely, providing a windfall to, professionals retained by the estate under § 328(a). *Coho Energy*, 395 F.3d at 204 ("When [the bankruptcy courts'] fee discretion began to dissuade professionals from offering their services to debtors, Congress passed section 328(a) of the bankruptcy code, which allowed professionals to have greater certainty as to their eventual payment."); *see also Barron II*, 325 F.3d at 695 (Jones, C.J., concurring) (referring to the attorney's fee as a "sizeable windfall" but agreeing that the attorney was entitled to receive it under § 328(a)); *Smart World*, 552 F.3d at 232 ("Where the court pre-approves the terms and conditions of the retention under section 328(a), its power to amend those terms is severely constrained."); *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862–63 (5th Cir. 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment. Courts must protect those agreements and expectations, once found to be acceptable.").

Thus, consistent with § 328(a)'s text and purpose, we have reversed a bankruptcy court's reduction of an attorney's contingency fee based on the

limited amount of work that was needed for the attorney to prevail in an adversary proceeding. *Barron II*, 325 F.3d at 691–92. In *Barron II*, the bankruptcy court had approved a 33% contingency fee under § 328(a) for an attorney retained by the estate to pursue a fraudulent transfer action against the debtor's husband. *Id.* After expeditiously obtaining and collecting on a judgment for $160,000, the attorney filed an application seeking a $53,333.33 fee, which amounted to 33% of the recovery. *Id.* at 692. The bankruptcy court refused to approve the application and instead reduced the attorney's fee to $24,341.25. *Id.* The court explained that a $53,333.33 fee was too high, and thus, improvident, in light of three developments: (1) it "did not anticipate the substantial amount of the subsequent recovery"; (2) the adversary proceeding was a "slam dunk," which enabled the attorney to prevail quickly; and (3) the judgment was collected with "relative ease." *Id.* at 693.

We reversed and reinstated the original contingency fee because: (1) the bankruptcy court had failed to explain specifically why the three subsequent developments were actually incapable of anticipation; and (2) the record indicated that the developments were foreseeable.[5] *Id.* at 693–94. In so doing, we made clear that fee arrangements approved under § 328(a) may not be cast aside merely because the fee appears excessive in hindsight at the end of the case. *Id.* at 693–95; *see also Smart World*, 552 F.3d at 235 ("[T]he fact that contingency fees may appear excessive in retrospect is not a ground to reduce them because 'early success by counsel is always a possibility capable of being

---

[5] In support of our conclusion that the developments were foreseeable, we explained that: (1) the bankruptcy court had previously received documents indicating that the husband owed $160,000; (2) before the attorney was retained, creditors had argued that the fraudulent transfer proceeding "would prove easy"; and (3) "[t]here [was] no evidence that [the debtor's husband] did not have funds with which to pay an eventual judgment or that he would be inclined to avoid his obligation. Although there was no certainty that [the attorney] would be able to collect the judgment, it seems to us one could equally reasonably anticipate that he might not unreasonably avoid payment, even if there was some possibility that collection would not be easy." *Id.* at 693–94.

anticipated.'" (quoting *In re Gilbertson*, 2007 WL 433096, at \*5 (E.D. Wisc. Feb. 4, 2007)). Such arrangements will be honored unless they are proved to fit within § 328(a)'s narrow improvidence exception. *Barron II*, 325 F.3d at 694.

We have upheld a bankruptcy court's revision of a fee arrangement pursuant to § 328(a)'s improvidence exception on only one occasion. *See Coho Energy*, 395 F.3d at 205. In *Coho Energy*, the debtor hired a law firm to represent it in a contract dispute. *Id.* at 200–01. The fee agreement, which was approved under § 328(a), provided that the attorneys would receive a 30% contingency fee, and that any disputes between that firm and the debtor would be resolved through arbitration. *Id.* at 201. The debtor subsequently terminated its relationship with that law firm and hired another to continue the litigation that had been commenced by the initial firm. *Id.* The successor law firm ultimately obtained an $8.5 million settlement in the debtor's favor. *Id.* Even though the new firm was successful in settling the contract dispute, the first firm initiated an arbitration proceeding against the debtor to recover its fees. *Id.* Not having been informed of the $8.5 million settlement, the arbitrator presumed that the litigation would settle for approximately $20 million and generate a $5.9 million contingency fee award for the original law firm.[6] *Id.* at 201, 205. The bankruptcy court did not adhere to the arbitrator's findings, and instead awarded the original firm only $1,540,625 in legal fees. *Id.* at 202. We affirmed the bankruptcy court's decision, holding that:

> One of the findings of the arbitration panel was that the full amount [the attorney] would be entitled to under the contract would be $5.9 million. This shows that the arbitration panel was operating on the assumption that the total settlement would be approximately $20 million. That the arbitration panel would be kept so ill-informed as

---

[6] The arbitrator also determined that the original firm would be entitled to a $2.9 million fee based on the *quantum meruit* doctrine. *Id.*

No. 11-41010

to use figures two and a half times in excess of the actual amount qualifies as an unanticipatable development . . . .

*Id.* at 205.  Thus, *Coho Energy* teaches that § 328(a)'s improvidence exception may be satisfied if: (1) the fee arrangement called for an adjudicatory body to resolve compensation disputes; and (2) that body's conclusions were premised on patently erroneous findings of fact.

Finally, it bears mention that the Bankruptcy Code does not require that, when setting their rate or means of payment at the commencement of an engagement, professionals select the rigid standards of § 328(a).  To the contrary, professionals employed by the estate have the option of being compensated under either § 328(a) or § 330(a).  *Barron II*, 325 F.3d at 692; *In re Texas Sec., Inc.*, 218 F.3d 443, 445 (5th Cir. 2000); *Nat'l Gypsum*, 123 F.3d at 862.  "Section 328 applies when the bankruptcy court approves a particular rate or means of payment [at the outset of the engagement], and § 330 applies when the court does not do so."  *Texas Sec.*, 218 F.3d at 445.  Section 330(a) is a far more flexible provision, authorizing bankruptcy courts to award "reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ."  11 U.S.C. § 330(a)(1)(A).  Unlike § 328(a), § 330(a) affords bankruptcy courts broad discretion when determining the amount that professionals should be paid after they have completed their engagements.  *See In re Babcock & Wilcox Co.*, 526 F.3d 824, 828 (5th Cir. 2008).  This discretion enables bankruptcy courts to consider numerous factors—including (1) the lodestar,[7] (2) those found in § 330(a)(3)'s non-exclusive list,[8] and (3) those listed

---

[7] "The lodestar amount is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work."  *Pilgrim's Pride*, 690 F.3d at 655 (internal quotation marks omitted).

[8] Section 330(a)(3) provides:

In determining the amount of reasonable compensation to be awarded to an

13

No. 11-41010

in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1994)[9]—when determining "reasonable compensation." *Pilgrim's Pride*, 690 F.3d at 654–56.  As discussed above, however, professionals may avoid subjecting their fees to the inherent uncertainty associated with such court discretion by

---

examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

[9] The twelve *Johnson* factors are:

(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

*Pilgrim's Pride*, 690 F.3d at 654 (quoting *Johnson*, 488 F.2d at 717–19).

14

No. 11-41010

obtaining prior approval of their fee arrangements under § 328(a).[10]  *See also Nat'l Gypsum*, 123 F.3d at 862 (explaining that, under § 330(a), "compensation [is] subject to the uncertainties of what a judge [thinks] the work [is] worth after it ha[s] been done"); *Smart World*, 552 F.3d at 232 ("[S]ection 328(a) permits a bankruptcy court to forgo a full post-hoc reasonableness inquiry.").  In so doing, however, professionals must accept the tradeoff presented by § 328(a).  That section's certainty and predictability come at the expense of flexibility: The professionals would be underpaid if their engagements should require more work than they had initially expected.  *See Nucentrix*, 314 B.R. at 580–81 ("[I]f a firm obtains the protection of Section 328, the firm and the Court must live with the conditions of that section.").

## B.

We now turn to the case at hand.  The district court affirmed the bankruptcy court's $975,000 fee enhancement based on numerous developments that it concluded were incapable of anticipation.  The first development involved the length of the ASARCO bankruptcy proceeding.  *ASARCO II*, 457 B.R. at 582.

---

[10] We note in passing, however, that when a court approves a specific hourly rate (*e.g.*, $200 per hour) pursuant to § 328(a) but fails to pre-approve the specific number of hours that will be billed at that pre-approved hourly rate, the court may review the hours billed for reasonableness in accordance with § 330(a).  *See In re Confections by Sandra, Inc.*, 83 B.R. 729, 733 (B.A.P. 9th Cir. 1987) ("Although the hourly rate was fixed by the May 10th order approving the fee arrangement, the hours expended in pursuing the claim were not fixed. Thus, under the hourly rate approach, the trial court would have discretion to review the appellant's fee schedules to determine if the hours expended were reasonable under the circumstances."); Stephen J. Lubben, *The Chapter 11 Financial Advisors*, 28 Emory Bankr. Dev. J. 11, 27–28 (2011) ("In short, § 328 involves whether the proposed hourly rate is reasonable, while § 330 involves consideration of whether the number of hours actually billed was reasonable.  The court approves the rate at the point of retention and the total number of hours at the point of the fee application.").  The court may not subsequently alter the pre-approved hourly rate, however, unless it proves "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *See* 11 U.S.C. § 328(a); *Texas Sec.*, 218 F.3d at 445–46.  On the other hand, when a court approves a contingency fee or flat fee under § 328(a), the court may never revisit the amount of the fee for reasonableness under § 330(a).  *See Barron II*, 325 F.3d at 693–95.

15

The bankruptcy court found that, when the parties inked the Engagement Letter, ASARCO's "restructuring process was expected to take the form of a quick sale," and that ASARCO "expected the bankruptcy to take about one month." *Id.*; *see also ASARCO I*, 2010 WL 4976937, at *3 ("In the early stages of this case, the Debtors' restructuring process was expected to take the form of a quick sale, because the company was unlikely to survive for long on its own in its then-current operational state."). The bankruptcy court found that this expectation was reasonable based on the public information available to Barclays at that time—which was limited because ASARCO was a non-public subsidiary of a foreign company. *ASARCO II*, 457 B.R. at 582. After being retained, however, Barclays became aware of numerous internal problems, which hindered ASARCO's ability to effectuate a quick sale:

> Since ASARCO was (and is) a non-public subsidiary of a foreign company, [Barclays] had no way of knowing that the Company had serious deficiencies in its internal management capabilities and reporting systems. Further, no one could have anticipated that the chief executive officer would be removed within one month or that the Board would be replaced twice within the first months of this case.

*Id.* (citation, internal quotation marks, and alterations omitted).

Second, in addition to the departures of the CEO and board of directors, ASARCO experienced a steady exodus of its salaried employees throughout 2005 and 2006. *Id.* at 582–83; *see also ASARCO I*, 2010 WL 4976937, at *5 (ASARCO was "losing personnel at an alarming rate"). The bankruptcy court found the scale of the employee exodus unusual, remarking that "although some management upheaval is to be expected in a Chapter 11 case, it would be difficult to forecast that a company with the size, complexity and history of ASARCO would lack depth of management to the extent of company [*sic*]." *ASARCO I*, 2010 WL 4976937, at *5. This prompted Barclays, at ASARCO's request, to develop an employee retention plan, a task that was specifically

No. 11-41010

excluded from the scope of Barclays's engagement. *ASARCO II*, 457 B.R. at 582–83.

The district court summarized other services performed by Barclays to help stabilize ASARCO, some that were outside the scope of the Engagement Letter and others that were not the kind traditionally performed by investment bankers, including the following:

> [Barclays] worked to resolve ASARCO's liquidity crisis, a "service beyond the scope of a traditional investment banker." To that end, it negotiated the terms of a debtor-in-possession financing facility ("DIP") and worked to resolve operational crises caused by the ongoing labor strike, both of which were instrumental in avoiding a disadvantageous quick liquidation.

> [Barclays] recruited new members to ASARCO's board of directors, and upon the board's request advised ASARCO's management on a daily basis on tasks that the debtor's management typically performs. This work included preparing "numerous reports analyzing budget and cash flow projections and certain metal purchase agreements," and [Barclays] professionals were permanently on-site at the Debtor's Tucson offices.

> . . .

> [Barclays] filled ASARCO's management vacuum caused by the dismissal of ASARCO's CEO and the absence of a CFO. [Barclays] acted in place of a CFO and later assisted the new CFO in several tasks, such as creating reports for constituents, managing communications with financial advisors and creditors, and obtaining and analyzing financial information.

> [Barclays] led searches for a new CEO and contacted Joseph Lapinsky, whose work as CEO was of enormous benefit to ASARCO. [Barclays] also worked to retain for ASARCO the management consulting firm of Alvarez & Marsal.

> [Barclays] designed and implemented a copper hedging program, "unique for a chapter 11 debtor outside of the ordinary course of the debtor's business," and expended many hours achieving a consensus regarding the hedging program among ASARCO's many creditors.

*Id.* (quoting *ASARCO I*, 2010 WL 4976937, at *4–7).

17

No. 11-41010

After explaining the nature of Barclays's expanded role in ASARCO's reorganization, the district court "turn[ed] to a review of the Bankruptcy Court's *factual determination* that [Barclays's] agreement was improvident and incapable of anticipation." *Id.* at 585 (emphasis added). The district court explained that it would conduct this review pursuant to the deferential clear error standard and then held that:

> Under this *deferential standard*, this Court affirms the Bankruptcy Court's determination that [Barclays's] arrangement was improvident and incapable of anticipation when it was made. There is ample evidence in the record to support the Bankruptcy Court's conclusions that the length and complexity of the bankruptcy were incapable of anticipation when [Barclays] entered into the engagement letter. . . . Evidence . . . also supports the finding that [Barclays] performed many services outside the scope of its original agreement, the need for which was incapable of anticipation when the agreement was made. This Court finds that the Bankruptcy Court's finding that Bar[clays] deserved $975,000 to make up for [Barclays's] services was supported by the record and *not clearly erroneous*; therefore, the Court affirms the award of $975,000 to Bar[clays].

*Id.* at 585 (emphasis added).

## C.

It is true that appellate courts must review the facts on which a fee award is based for clear error. *See Quinlivan*, 434 F.3d at 318. In the context of a § 328(a) award, however, clear error is not the appropriate standard for reviewing a conclusion that the facts (*i.e.*, the subsequent developments) were "not capable of being anticipated." *See* 11 U.S.C. § 328(a). The question whether subsequent developments were "not capable of being anticipated" is, at the very least, a mixed question of law and fact, if not a pure question of law, subject in either case to de novo review. *See Barron II*, 325 F.3d at 693 (holding "as a matter of law, that none of the[] facts or developments [were] 'not capable of being anticipated' within the meaning of Section 328(a)"); *see also Quinlivan*, 434

F.3d at 318 (providing that questions of law and mixed questions of law and fact are reviewed de novo). Thus, the district court erred in reviewing the bankruptcy court's conclusion that the subsequent developments were "not capable of being anticipated" for clear error. Moreover, the district court erred in reviewing the amount of the bankruptcy court's fee enhancement for clear error. *See ASARCO II*, 457 B.R. at 585. We review the amount of the fees awarded by the bankruptcy court for abuse of discretion. *See Barron I*, 225 F.3d at 585.

We reverse the bankruptcy court because none of the facts on which the $975,000 enhancement is based satisfy § 328(a)'s improvidence exception. The bankruptcy court's analysis focused on the notion that, given ASARCO's status as a non-public subsidiary of a foreign corporation, Barclays did not know—and was incapable of discovering—how dysfunctional ASARCO truly was at the time that it agreed to the terms of the Engagement Letter. The bankruptcy court also relied heavily on the fact that many of ASARCO's executives, directors, and salaried employees had jumped ship during the pendency of the bankruptcy case, resulting in a significant vacuum of leadership and management. The additional services performed by Barclays were aimed at reducing ASARCO's dysfunction and filling the gaps created by those who had left. Although these efforts were commendable, we conclude that the developments giving rise to the need for Barclays's additional services were capable of being anticipated and, therefore, fail to satisfy § 328(a)'s improvidence exception.

Barclays contends, in essence, that when it agreed to the terms of the Engagement Letter, it anticipated that ASARCO would be making a quick stop in Chapter 11. To analogize, Barclays apparently thought that it had a dusty, yet functional, Corvette on its hands. Although it needed a little polish, this Corvette was poised for a speedy trip into and out of Chapter 11 with the help of an experienced driver, *i.e.*, Barclays. Once in the driver's seat, however,

Barclays realized that the Corvette needed far more than a car wash. The dust was nothing compared to the disarray that it discovered "under the hood." Assuming, *arguendo*, that Barclays did not know that ASARCO had more serious problems, we nevertheless conclude that it could have and should have anticipated, within the meaning of § 328(a), that a company in need of a Chapter 11 reorganization might have latent problems lurking under its hood. *Cf. In re Home Express, Inc.*, 213 B.R. 162, 165 (Bankr. N.D. Cal. 1997) ("[B]ad management is too often the norm in Chapter 11 cases."). It is foreseeable that such problems, once discovered, could transform what was expected to be a pit-stop into a lengthy reorganization process, requiring considerably more work than was initially expected.

Here, the record indicates that, much like the dusty Corvette, ASARCO was coated in, at the very least, a substantial layer of dust when Barclays agreed to the terms of the Engagement Letter. At that time, a union was on strike and "no end to the strike was in sight." *ASARCO I*, 2010 WL 4976937, at *4. In the words of the bankruptcy court, the strike made it "impossible to predict when [ASARCO's] employees would return to their jobs and allow [ASARCO] to *resume normal operations.*" *Id.* (emphasis added). Further, Barclays was well aware that ASARCO's bankruptcy filing had been precipitated by, in addition to the labor crisis, "billions of dollars in environmental and asbestos liability, and a decline in copper prices." *ASARCO II*, 457 B.R. at 578. Thus, Barclays was capable of anticipating that its plans for a quick pit-stop reorganization could be slowed by the problems of which it was aware, like the labor strike, as well as other foreseeable problems—such as inadequate leadership, management, internal controls, and reporting systems—that it had not yet discovered. *See Home Express*, 213 B.R. at 165 (explaining that surprises are common in Chapter 11 proceedings).

No. 11-41010

Moreover, Barclays's Engagement Letter with ASARCO clearly illustrates the parties' understanding that the reorganization process could last well over one month, if not multiple years. Specifically, the Engagement Letter provided that Barclays would receive a $100,000 monthly advisory fee for the first 24 months of service and, thereafter, $75,000 per month until the end of Barclays's engagement. These terms are significant because courts routinely hold that subsequent developments were capable of being anticipated when the engagement agreement explicitly plans for the possibility that such developments might occur. *See, e.g., Smart World*, 552 F.3d at 235 ("[T]he prospect of prolonged litigation always exists, and was clearly anticipated by the parties, who made [the attorneys'] contingent fee a function of the length of the litigation."); *In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327, 337 (Bankr. D. Md. 2000) (pre-trial settlement was capable of being anticipated as the parties' contingency fee agreement established the applicable fee in the event of a settlement); *Confections by Sandra*, 83 B.R. at 733 (same); *Liani v. Baker*, 2010 WL 2653392, at *10 (E.D.N.Y. June 28, 2010) ("[I]t was impossible to argue that Liani's default was a development 'not capable of being anticipated' . . . [because the] very provision at issue was included in the agreement precisely because the possibility of default *was* anticipated."). Accordingly, the Engagement Letter itself undermines Barclays's contention that a protracted reorganization could not have been anticipated. It demonstrates the parties' own understanding that the engagement could last for more than two years. *See also ASARCO II*, 457 B.R. at 585 n.6 ("This Court finds it incredible that any sophisticated lawyer or advisor actually thought that this bankruptcy would last for only one month.").

We are also unpersuaded by Barclays's proffered excuse that it had no way of knowing—and, therefore, could not have anticipated—the full extent of ASARCO's internal disarray because ASARCO was a non-public subsidiary that did not share confidential information prior to Barclays's retention. Barclays's

theory essentially concedes that, when it signed up for the job, it knew that it lacked a complete understanding of ASARCO's overall condition. Cognizant of this information gap, it nevertheless agreed to be compensated in accordance with the rigid standards found in § 328(a). Barclays was not required to do so; it could have chosen to be compensated under § 330(a), which gives bankruptcy courts broad discretion to award reasonable fees after the engagement has ended. *See Barron II*, 325 F.3d at 692; *Texas Sec.*, 218 F.3d at 445; *Nat'l Gypsum*, 123 F.3d at 862. This would have easily enabled Barclays to seek more compensation than it expected to request at the outset of the case if it ultimately provided more services than originally anticipated. Barclays chose to be compensated in accordance with § 328(a), however, which mandates a different, immutable bargain. As Barclays enjoyed the benefits of this bargain by, for example, obtaining pre-approval of a $4 million transaction fee,[11] it must now bear § 328(a)'s burdens. *In re Amberjack Interests, Inc.*, 326 B.R. 379, 387 (Bankr. S.D. Tex. 2005) ("[Fee applicant who] enjoyed the benefit of Section 328(a) in protecting his fee from potential reduction . . . must also accept Section 328(a)'s rigid standard in attempting to enhance his fee."). Because Barclays knew when it signed the Engagement Letter that it lacked complete information, it cannot now seek additional compensation simply because the previously undisclosed information reduced Barclays's projected bottom-line. Barclays could have anticipated this outcome and should have accounted for it in the fee arrangement that was approved under § 328(a).[12] *See also Home Express*, 213

---

[11] This transaction fee was later increased to $5 million after Barclays renegotiated the terms of the Engagement Letter.

[12] We also generally disagree with the distinction Barclays makes between public and private companies. If we accepted Barclays's theory, it would likely make it easier for those employed by private companies, which comprise the majority of Chapter 11 filers, to seek to re-write their compensation terms after the engagement has ended, thus undermining § 328(a)'s framework. Such professionals would simply need to point to confidential information that they were prevented from accessing pre-retention when arguing that

No. 11-41010

B.R. at 165 ("[M]ost Chapter 11 cases are filled with surprises, both good and bad, and [professionals] should build such contingencies into their flat fee.").

Likewise, we find no merit in Barclays's contention that the employee exodus was incapable of anticipation. The bankruptcy court acknowledged that "some management upheaval *is to be expected* in a chapter 11 case" but then concluded that "it would be *difficult to forecast* that a company with the size, complexity, and history of ASARCO" would have such a steady loss of salaried employees. *ASARCO I*, 2010 WL 4976937, at *5 (emphasis added). We conclude that, although the parties might not have expected such an extraordinary employee exodus, they could have anticipated that executives, board members, and salaried employees would depart the company after it filed a Chapter 11 petition. *See* Michelle M. Harner, *The Corporate Governance and Public Policy Implications of Activist Distressed Debt Investing*, 77 FORDHAM L. REV. 703, 759 n.352 (2008) ("Management turnover in connection with a Chapter 11 case is not a new development."); Lynn M. LoPucki & William C. Whitford, *Corporate Governance in the Bankruptcy Reorganization of Large, Publicly Held Companies*, 141 U. PA. L. REV. 669, 723–38 (1993) (discussing empirical research indicating that turnover among chief executive officers is common during the pendency of Chapter 11 proceedings). The fact that the number of personnel departures was above average, or even extraordinary, does not transform a foreseeable development into one that is incapable of anticipation. *Cf. Nucentrix*, 314 B.R. at 580 ("While no party, even including this Court, expected the auction process would be so successful, the success of the auction was capable of being anticipated.").

---

subsequent developments, which required additional, unexpected services, were incapable of anticipation. We decline to open this door.

No. 11-41010

Finally, although Barclays undertook numerous tasks, discussed *supra*, that either went beyond the scope of the Engagement Letter or constituted services not typically performed by investment banks, *see ASARCO II*, 457 B.R. at 582–83, the bankruptcy court failed to explain with the requisite specificity why Barclays was incapable of anticipating that it would be asked to perform such services. *See Barron II*, 325 F.3d at 693 (bankruptcy court must explain with specificity why developments were "incapable of being foreseen"); 3 Collier on Bankruptcy § 328.01 ("A failure by the bankruptcy court to make a record establishing that the approval was improvident and *setting out with specificity (not conclusory statements)* the development that could not have been anticipated at the time of approval will be insufficient to comply with the requirements of section 328.") (emphasis added). Thus, on this record, we conclude that the bankruptcy court erred in granting fee enhancements based on services that fell outside the scope of Barclays's engagement.[13]

In sum, we conclude that all of the subsequent developments in the ASARCO bankruptcy proceeding were "capable of being anticipated" within the meaning of § 328(a). Accordingly, the bankruptcy court erred in awarding Barclays a $975,000 fee enhancement based on § 328(a).

## IV.

The second issue presented in this case is whether the bankruptcy court erred in denying the $2 million Success Fee sought by Barclays. Although we find no reversible error, we remand to the district court with instructions to remand to the bankruptcy court for it to consider whether a Success Fee is

---

[13] To the extent the enhancements were based on the employee exodus or the unexpected internal dysfunction at ASARCO, they were improper because, as discussed *supra*, those developments were capable of being anticipated.

24

## No. 11-41010

appropriate in light of our conclusion that the $975,000 fee enhancement award was made in error.[14]

### A.

Barclays first contends that the bankruptcy court "erred by not applying 11 U.S.C. § 330's reasonableness test to the requested fee, which should have governed because the amount of the success fee was not pre-approved." In support, Barclays relies on our statement in *Texas Securities* that § 328(a) "applies when the bankruptcy court approves a particular rate or means of payment, and § 330 applies when the court does not do so." 218 F.3d at 445. Barclays contends that because the Revised Engagement Letter "did not specify an amount for the success fee, the bankruptcy court should have considered § 330(a)(3)'s reasonableness factors."

> Paragraph 6(f) of the Revised Engagement Letter authorized Barclays:
>
> to apply to the court for final approval of an additional discretionary fee based upon the successful outcome of the Chapter 11 case. This fee shall be based upon a variety of factors including but not limited to quality of service, creativity of advice, and comparable market rates, all of which should be evaluated by the most objective standard available.

*ASARCO I*, 2010 WL 4976937, at *10.

Without addressing § 330(a)(3), the bankruptcy court denied Barclays's request for the discretionary Success Fee because it found that it had already awarded Barclays sufficient compensation:

> There is no dispute that these Chapter 11 Cases were a remarkable success. Moreover, Bar[clays'] advice, commitment, and undertaking of a variety of tasks, including those that are typically

---

[14] We do so because the bankruptcy court's finding—that it had awarded Barclays sufficient compensation and did not need to award a Success Fee—was based in part on the $975,000 fee enhancement. Accordingly, the bankruptcy court, on remand from the district court, must consider whether a discretionary Success Fee should be awarded, and, if so, in what amount.

not performed by investment bankers, provided benefits to the estate. Indeed, both this Court and the District Court recognized the benefits conferred upon the estate by Bar[clays]. The contract rate plus the additional [$975,000 in] fees awarded herein provide Bar[clays] with reasonable compensation for the services performed at a market rate. Therefore, taking into consideration the nonexclusive factors set out in the Bar[clays] engagement letter, the Court finds that no additional compensation is warranted.

*Id.* at *11.

We conclude that the bankruptcy court did not err in declining to consult the factors listed in § 330(a)(3). Nothing in Paragraph 6(f) required the bankruptcy court to consult § 330(a)(3) and, more importantly, the Revised Engagement Letter explicitly disclaims consideration of that provision. Paragraph 11 of the Revised Engagement Letter provides that Barclays's retention would be "subject to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to any other standard of review under section 330 of the Bankruptcy Code." We adhere to the parties' wishes as expressed in the Revised Engagement Letter.

Further, Barclays's reliance on *Texas Securities* is misplaced. There, we were asked to determine whether an attorney's employment was "governed by 11 U.S.C. § 328 or 11 U.S.C. § 330." *Texas Sec.*, 218 F.3d at 444. The question arose because the bankruptcy court's order approving the attorney's employment was ambiguous as to which provision governed. *See id.* at 444–45. We resolved the dispute by applying the rule that § 328(a) "applies when the bankruptcy court approves a particular rate or means of payment, and § 330 applies when the court does not do so." *Id.* at 445. In this case, however, there is no question that Barclays's engagement was governed by § 328(a). We are only asked to address the much narrower question: whether § 330(a)(3)'s factors must be considered when a compensation arrangement that was approved under § 328(a)

provides for a discretionary success fee. *Texas Securities* provides no assistance in resolving this discrete issue.

In disputes governed by § 328(a), the contractual arrangement is supreme, and we shall enforce the contract as written. *See Nat'l Gypsum*, 123 F.3d at 862 ("Courts must protect those [§ 328(a)] agreements and expectations, once found to be acceptable."); *cf. In re Citation Corp.*, 493 F.3d 1319, 1319 (11th Cir. 2007) (explaining that it is appropriate for the court to recognize that the employment contract "was a product of free and equal bargaining by sophisticated, knowledgeable parties" when considering whether to adjust a fee pre-approved under § 328). If Barclays wanted the Success Fee to be evaluated in light of the factors found in § 330(a)(3), it should have provided for such review expressly in the Revised Engagement Letter. Because the Revised Engagement Letter is devoid of any such mandate, the bankruptcy court did not err in declining to address § 330(a)(3).[15]

## B.

Barclays next contends that the bankruptcy court incorrectly focused on Paragraph 6(f)'s "comparable market rates" factor and failed to consider the other factors listed in that paragraph when declining to award the Success Fee. We disagree. The bankruptcy court's opinion stated that it considered "the nonexclusive factors set out in the" Revised Engagement Letter. *See ASARCO I*, 2010 WL 4976937, at *11. Accordingly, Barclays's claim to the contrary is without merit.

---

[15] We note that the three factors found in Paragraph 6(f) are unquestionably non-exclusive. Accordingly, the bankruptcy court would have been acting within its discretion by considering § 330(a)(3) when evaluating whether to grant the Success Fee. Nothing in Paragraph 6(f) required the bankruptcy court to do so, however, and we find no error in its decision not to consider the factors listed in § 330(a)(3).

No. 11-41010

## C.

Finally, Barclays argues that the bankruptcy court "made a clearly erroneous factual finding that Bar[clays] had received market rate [compensation] when both parties' evidence showed to the contrary." Our review of the record leaves us with the definite and firm conviction that no such error occurred. *See Quinlivan*, 434 F.3d at 318. Accordingly, we reject Barclays's contention that the bankruptcy court clearly erred in finding that Barclays was compensated at market rate.

## V.

For the foregoing reasons, we REVERSE the $975,000 fee enhancement award and we REMAND to the district court for further proceedings consistent with this opinion.