# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2022

Lyle W. Cayce
Clerk

———————

No. 20-61011

———————

In the Matter of: Community Home Financial Services
Corporation,

*Debtor*,

————————————————————

Edwards Family Partnership, L.P.; Beher Holdings
Trust,

*Appellants—Cross-Appellees*,

*versus*

Kristina M. Johnson, Trustee for Community Home
Financial Services Corporation,

*Appellee—Cross-Appellant*.

————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:18-CV-154
USDC No. 3:18-CV-155
USDC No. 3:18-CV-156
USDC No. 3:18-CV-157

————————————————————

No. 20-61011

Before Dennis, Higginson, and Costa, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

This is a second review appeal and cross-appeal from consolidated matters in the Bankruptcy Court for the Southern District of Mississippi. The dispute centers around a business relationship between companies owned by Dr. Charles C. Edwards and William D. Dickson. Appellants are the Edwards Family Partnership ("EFP") and Beher Holdings Trust ("BHT"), two companies owned by Edwards and collectively referred to as the "Edwards entities." Appellee/Cross-Appellant is Trustee Kristina M. Johnson, who presently manages Dickson's former company, Community Home Financial Services Corporation ("CHFS"). The parties each raise four issues on appeal relating to the business relationship between EFP, BHT, and CHFS. We AFFIRM the district court's decision in part, REVERSE in part, and REMAND.

## I.

## A.

## i.

The lengthy relationship between Edwards, an orthopedic surgeon from Maryland, and Dickson, a business owner from Jackson, Mississippi, began sixteen years ago. Both Edwards and Dickson owned and operated multiple family businesses. The two men were introduced by a broker hired by Dickson to find a replacement lender for CHFS. CHFS is a mortgage servicing entity, managed by Dickson, that purchased discounted mortgage loan portfolios from third parties and serviced those loans, as well as servicing loans from several affiliated companies.

In July 2006, Edwards and Dickson met for the first time. Edwards's daughter then traveled to Jackson, Mississippi, where CHFS was

headquartered, to survey the company's business operations. Although Edwards's daughter had no expertise in the realm of mortgage servicing, she reported favorably to her father about CHFS. Sometime thereafter, Edwards and Dickson commenced their first business deal, a credit facility of $10 million to fund the purchase of home improvement loans.

To conserve financial resources and to expedite the arrangements, an employee of CHFS, who happened to be a disbarred attorney, drafted the loan documents, using as forms the documents prepared by CHFS's prior lender, cutting and pasting different names and addresses where appropriate. Meanwhile, Edwards relied on his daughter, who is not an accountant, to review CHFS's financial reports, to calculate the principal balance and interest due on the promissory notes each month, and to determine "eligible receivables" based on a "Borrowing Base Certificate."

Although the financial entanglements of Edwards and Dickson contained many elements, the present dispute centers around two business transactions: (1) the initial home improvement loans from Edwards to CHFS and (2) a subsequent arrangement of seven mortgage portfolios of subprime loans (the "Mortgage Portfolios") purchased as "joint ventures" between Edwards and CHFS. In total, Edwards's proofs of claim with respect to his financial arrangements with Dickson and CHFS amount to roughly $30 million.

ii.

The first deal between Edwards and CHFS, which began in 2006, pertained to "Home Improvement Line" loans (otherwise known as the "home improvement loans" or the "Home Improvement Line"). Edwards agreed to loan $10 million to CHFS through his company Rainbow Group. CHFS used the funds from Rainbow Group/Edwards to purchase consumer

No. 20-61011

mortgages taken out by individuals seeking to improve their homes.[1] CHFS then serviced the purchased mortgages and sent Rainbow Group the interest it owed.[2] Nearly 2,000 home improvement loans were handled through this arrangement, with roughly $600,000 to $700,000 flowing through the deal each month.

CHFS established a custodial agreement with Harold B. McCarley, Jr., PLLC, a Mississippi law firm, designating attorney Harold McCarley, Jr., as the custodian of the original loan documents and assignments for Rainbow Group's benefit. McCarley testified in the bankruptcy trial that he holds these documents and releases them only upon receipt of a written request signed by CHFS and Rainbow Group (or other entity identified by Edwards).

The Home Improvement Loan Agreement gives Rainbow Group the authority to assign its rights and duties as Lender, pursuant to Paragraph 9.6 of the agreement, which reads:

> 9.6 ASSIGNMENT BY LENDER. LENDER MAY AT ANY TIME (A) DIVIDE AND REISSUE (WITHOUT SUBSTANTIVE CHANGES OTHER THAN RESULTING FROM SUCH DIVISION) THE NOTE, AND/OR (B) SELL, ASSIGN, GRANT PARTICIPATION IN, DELEGATE OR OTHERWISE TRANSFER TO ANY OTHER PERSON (AN "ASSIGNEE") ALL OR PART OF RIGHTS AND DUTIES OF LENDER UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. TO THE EXTENT INDICATED IN ANY DOCUMENT, INSTRUMENT OR AGREEMENT SO SELLING,

---

[1] The nature of the mortgages in question is the origin for the name "Home Improvement Line."

[2] More specific details regarding the financial terms of the initial Home Improvement Line agreement between Rainbow Group and CHFS can be found in the bankruptcy court opinion.

No. 20-61011

ASSIGNING, GRANTING PARTICIPATION IN, OR OTHERWISE TRANSFERRING TO AN ASSIGNEE SUCH RIGHTS AND/OR DUTIES, (I) THE ASSIGNEE SHALL ACQUIRE ALL THE LENDER'S RIGHTS UNDER THE AGREEMENT AND THE OTHER LOAN DOCUMENTS AND (II) THE ASSIGNEE SHALL BE DEEMED TO BE THE "LENDER" UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WITH THE AUTHORITY TO EXERCISE SUCH RIGHTS IN THE CAPACITY OF LENDER.

Edwards exercised this authority twice on behalf of Rainbow Group. In 2007, Edwards assigned Rainbow Group's rights and duties to Beher Holdings Limited ("BHL").[3] Then in 2010, Edwards re-assigned and split rights to the Home Improvement Line loans between the present appellants: EFP and BHT. In each instance, when Edwards exercised his reassignment powers, the business relationship between Edwards and CHFS remained fundamentally unchanged. Several years after the initial 2006 loan agreement, Edwards and CHFS entered into amended loan agreements with respect to the Home Improvement Line. The amended agreements resulted in a $4 million commercial note and line of credit between CHFS and EFP, as well as a $12 million commercial note and line of credit between CHFS and BHT. The parties do not dispute that by the time CHFS declared bankruptcy in 2012, it owed the Edwards entities $17.8 million on these notes.

---

[3] Beher Holdings Limited is a British Virgin Islands company, acquired by Dr. Edwards for the purpose of the assignment orchestrated between BHL and the Rainbow Group.

No. 20-61011

iii.

In 2008, Edwards began to pursue a second type of investment with Dickson and CHFS. Because of the nationwide financial crisis at the time, Dickson believed that CHFS could purchase subprime loan portfolios at a favorable price. Accordingly, Dickson approached Edwards about providing roughly $9 million through various entities to CHFS to purchase seven mortgage portfolios (the "Mortgage Portfolios") of subprime loans. The Edwards entities maintain that Edwards did not intend for these transactions to be considered loans but rather "joint ventures" between the Edwards entities and CHFS.

Edwards (acting on behalf of EFP and BHT) finalized agreements with CHFS to purchase the Mortgage Portfolios between January 2008 and March 2011. The parties to Mortgage Portfolios #1-6 are CHFS and Appellant EFP. The parties to Mortgage Portfolio #7 are CHFS and Appellant BHT. Only three of the Mortgage Portfolio transactions between the Edwards entities and CHFS are documented in writing (Mortgage Portfolios #1, 2, and 7).

The parties do not dispute that the Edwards entities funded the purchase of the Mortgage Portfolios. Although the purchases of the seven portfolios were funded directly by entities purportedly controlled by Edwards (not necessarily EFP/BHT), all portfolio purchase agreements were between CHFS and the portfolio seller. Moreover, for Portfolios #1-6, the portfolio sellers assigned the loans to CHFS. The original notes and assignments comprising the consumer loans in Portfolios #1-6 are in EFP's possession as "collateral."

The agreement between CHFS and BHT regarding Portfolio #7 "contains terms that are materially different" from the agreements for

No. 20-61011

Mortgage Portfolios #1-6.[4]  The parties to the agreement decided the original notes and assignments in Portfolio #7 would not be held by CHFS, Dickson, Edwards, or BHT, but rather by a third party.  Currently, these custodial documents for Portfolio #7 are missing.[5]

It is undisputed that when CHFS declared bankruptcy, the investment in the portfolios that had not yet been recouped by the Edwards entities was $11,780,451.

### B.

### i.

In 2010, the business relationship between Edwards and Dickson started to deteriorate.  The deterioration culminated in a lawsuit filed in February 2012 by CHFS and Dickson against Edwards in Mississippi state court. On April 11, 2012, Edwards and EFP/BHT removed the original state court lawsuit to the United States District Court for the Southern District of Mississippi.  Shortly thereafter, EFP/BHT filed an emergency motion for immediate appointment of a receiver for CHFS.  Just as the district court was

---

[4] Unlike the other agreements, Portfolio #7's agreement required CHFS to pay all of its due diligence expenses, and CHFS received a reduced monthly servicing fee of only $15 per month.  Under the terms of this agreement, CHFS was not entitled to receive any distribution of its 25 percent share of the net proceeds until BHT recovered its entire cash contribution.  In addition, the agreement states that "benefits and obligations of the Purchase Agreement have been assigned from CHFS to [BHT].  [BHT] will be the beneficial owner of the loans, subject to the terms of this Joint Venture."

[5] Patrick Frascogna, a Mississippi attorney whose law office was in the same building as the CHFS headquarters, was supposed to keep the notes and assignments for Portfolio #7 in his custody.  However, Frascogna either released the loan documents to Dickson or never received them.  Dickson claims that the documents are in a Panamanian warehouse but has not divulged the location of the warehouse.

about to conclude its trial in the matter of the receivership,[6] CHFS voluntarily filed a Chapter 11 petition for relief, which stayed all proceedings against CHFS in the receivership action.

Amid the bankruptcy proceedings (sometime in 2013), Dickson absconded to Costa Rica to establish "rogue" operations of the CHFS business outside of the United States. The parties do not dispute that Dickson stole nearly $10 million from CHFS bank accounts while in South America. Dickson also shipped various pieces of office equipment, several computer servers, and many of CHFS's loan records to Costa Rica. Ultimately, Dickson was returned to the United States in federal custody, arrested for bank fraud, and indicted on April 9, 2014.

In 2012, EFP/BHT filed a Motion to Appoint Chapter 11 Trustee for CHFS based on the alleged misconduct of CHFS and Dickson.[7] Then in December 2013, the bankruptcy court entered an Order Granting United States Trustee's Emergency Motion for Order for the Appointment of a Chapter 11 Trustee. Over the objection of the Edwards entities,[8] the bankruptcy court appointed Appellee Kristina Johnson ("Johnson" or

---

[6] The Edwards entities allege that after hearing testimony in the receivership matter, the district court judge "indicated that a receivership would likely be imposed."

[7] A bankruptcy trustee is entrusted with specific, legally binding responsibilities, which are "extensive." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985). "A trustee shall . . . investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business." 11 U.S.C. § 1106(a)(3). The trustee, as well as the trustee's attorneys, "are held to high fiduciary standards of conduct." *Matter of Evangeline Ref. Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989).

[8] The Edwards entities objected to Johnson's appointment as Chapter 11 trustee on the grounds that Johnson's law firm was representing the accounting firm retained by CHFS as an expert witness in the bankruptcy case. The bankruptcy court found Johnson had no conflict.

"Trustee") as the Chapter 11 trustee for CHFS on January 21, 2014. Johnson subsequently hired the law firm at which she is a partner, to represent her[9] in the matter.  Once the order granting the emergency motion for the appointment of a Chapter 11 trustee – in this case Johnson – was entered, Dickson no longer had any decision-making authority for CHFS. *See* 11 U.S.C. § 704, § 1106.  Nevertheless, Dickson's illicit activities with respect to CHFS continued until he was taken into federal custody.

ii.

In September 2014, Edwards was contacted by a business associate of Dickson's in Costa Rica, Mike James Meehan ("Meehan").  Edwards and Meehan began to communicate sporadically over email regarding the affairs of CHFS in Costa Rica.  Edwards and Meehan's correspondence lasted for roughly five months.

Emails between Edwards and Meehan reveal that Edwards sent Meehan wire transfers in exchange for information about CHFS's South American operations on multiple occasions.[10]  Sometime during the email correspondence period, Meehan emailed Edwards a link to a Dropbox folder that contained data on CHFS pulled from a CHFS computer.  After Edwards informed Meehan that he was unable to access the Dropbox folder, Meehan mailed Edwards two compact discs ("CDs") with the information in question.  Edwards testified at trial "that he believed the CDs to be duplicates of each other," with no relevant or new information.

---

[9] The district court order opined on the troubling incentives associated with the arrangement between Johnson and her law firm in this case.  Thus far, more than thirty lawyers have billed the estate for work on this matter, amounting to over $5 million in legal fees for which the estate is now responsible.

[10] Specifically, Edwards testified at trial that he wired Meehan money "out of just appreciation."

No. 20-61011

In addition to corresponding over email, Edwards traveled to Costa Rica to meet with Meehan in person in December 2014. After this visit, Edwards, once again, reached out to Meehan over email seeking information from the hard drives of computers in the CHFS Costa Rica office, as well as information about assets seized by the Costa Rican government from Dickson. Edwards claims that the only information he received from Meehan were "some computer records of the Home Improvement Loans and the other EFP/BHT portfolios that Meehan copied onto CDs."

Meehan did not attempt to contact Johnson until February 2015 (roughly five months after contacting Edwards). Before Meehan reached out to Johnson, she was unaware of the location of CHFS's computers, books, and records in Costa Rica and had no knowledge of the financial affairs of CHFS in South America. Johnson alleges that, because of Edwards's communications with Meehan, Edwards had extensive knowledge of various matters related to CHFS's business affairs for several months,[11] while she remained in the dark as to the same information.

In response, Johnson filed the PPC Amended Complaint against Edwards and the Edwards entities alleging violations of the automatic stay under 11 U.S.C. §§ 105(a), 362(a), (k). In the Amended Complaint, Trustee Johnson estimated that the estate was forced to incur additional servicing costs of more than $10,000, which could have been avoided if Edwards had notified Johnson of his communications with Meehan or turned over the information he possessed. Additionally, Johnson alleged that Edwards's

---

[11] According to Johnson, as referenced in the bankruptcy court opinion, Edwards "had knowledge of approximately 2,000 loans, at least two bank accounts in CHFS's name (one with Banco de Costa Rica and the other with Banco Panameño), over $1.5 million in loans purchased in Costa Rica with funds stolen from the estate, and the names of two CHFS affiliates (Pirrana SA and Mary Madison Foundation)[.]"

No. 20-61011

actions with respect to Meehan cost her an opportunity to obtain CHFS assets that were either seized or frozen by the Costa Rican government, thereby incurring greater legal fees and expenses to retrieve the repossessed assets.  At the time of the bankruptcy trial, Johnson estimated the estate had "incurred legal fees and expenses attributable to Edwards's conduct in excess of $61,458.2535" and would continue to incur additional expenses. The bankruptcy court consolidated the PPC Amended Complaint with the other related proceedings in an order on February 15, 2017.

iii.

From October 30, 2017, through November 2, 2017, and on November 27, 2017, the bankruptcy court conducted a consolidated trial consisting of three adversary proceedings and five related contested matters. Judge Olack issued a far-reaching opinion in February 2018.  With respect to the issues presently before this court on appeal, the bankruptcy court concluded:

A. Mortgage Portfolios

1) The Loans to CHFS to purchase Mortgage Portfolios #3-6 were  barred by the statute of frauds and, therefore, were unenforceable against the estate.

2) The Edwards entities were entitled (in 2018) to $788,611 for their secured claim on the loans for Mortgage Portfolio #1-2.

3) Johnson was not required to return collections from Mortgage Portfolio #7 to the Edwards entities.

B. Home Improvement Line Loans

1) Trustee Johnson was entitled to a judgment that the 2010 Assignment is void.

No. 20-61011

C. Tracing

1) EFP/BHT were not entitled to a judgment declaring that they have a security interest in any of the stolen funds recovered or intercepted by the Trustee.

D. Post-Petition Adversary Conduct

1) Trustee Johnson was entitled to a judgment against Edwards and EFP/BHT, jointly and severally, for the conversion of the original CD.

2) Trustee Johnson was entitled to damages against Edwards and EFP/BHT, jointly and severally, for violations of the automatic stay.

iv.

On October 2, 2020, the district court issued a memorandum opinion and judgment affirming in part, reversing in part, and rendering in part the bankruptcy court's opinion. With respect to the issues presently on appeal, the district court concluded:

A. Mortgage Portfolios

1) The bankruptcy court's rulings on the mortgage portfolios were within the standard of review and affirmed.

B. Home Improvement Line Loans

1) Trustee Johnson's challenge to Dr. Edwards's internal 2010 Assignment was reversed and rendered.

C. Post-Petition Adversary Conduct

1) The Trustee's conversion claim was reversed and rendered.

2) The bankruptcy court's findings under § 362(k) were vacated and remanded. The district court held that "[i]f it is determined [on remand] that fees should be awarded, the court should clearly explain how it arrived at the level of compensation awarded."

No. 20-61011

## II.

A district court reviewing the final judgement of a bankruptcy court uses the clearly erroneous standard of review for questions of fact and a de novo standard of review for conclusions of law. *In re Gerhardt,* 348 F.3d 89, 91 (5th Cir. 2003). When we review the decision of a district court, sitting in its bankruptcy appellate capacity, we apply the same standards of review. *In re SI Restructuring, Inc.*, 542 F.3d 131, 134 (5th Cir. 2008). *See also Barron & Newburger, P.C. v. Tex. Skyline, Ltd.* (*In re Woerner*), 783 F.3d 266, 270 (5th Cir. 2015) (en banc). We also apply these standards when reviewing a bankruptcy court's final judgements directly. *In re ASARCO, L.L.C.*, 702 F.3d 250, 257 (5th Cir. 2012).

## III.

### A.

The Edwards entities first ask this court to overturn the bankruptcy court's conclusion that the entities' right to repayment for the funding of Mortgage Portfolios #3-6 is barred by the statute of frauds. The Edwards entities argue the "statute of frauds does not apply to agreements already fully performed by one party; or to agreements capable of being fully performed within 15 months, even if performance is not expected."

Mississippi law provides that "[a]n action shall not be brought . . . upon any agreement which is not to be performed within the space of fifteen months from the making thereof" unless the agreement is "in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing." Miss. Code Ann. § 15-3-1. The Mississippi Supreme Court and our court have both previously struck down loan agreements with durations that fell beyond the fifteen-month period. *See, e.g.*, *Fireman's Fund Ins. Co. v. Williams*, 154 So. 545, 547 (Miss. 1934) *Williams v. Evans*, 547 So. 2d 54, 56 (Miss. 1989); *Stahlman v.*

No. 20-61011

*Nat'l Lead Co.*, 318 F.2d 388, 395 (5th Cir. 1963). However, the Mississippi Supreme Court has also considered the indefinite duration of an agreement to be a determinative factor in removing the agreement from the statute of frauds consideration. *See, e.g.*, *Beane v. Bowden*, 399 So. 2d 1358, 1361 (Miss. 1981) ("[T]he oral contract was of an indefinite duration and susceptible of performance within 15 months, thus removing it from the statute of frauds."). *See also Morgan v. Jackson Ready-Mix Concrete*, 157 So. 2d 772, 779 (Miss. 1963) ("The possibility of performance within fifteen months takes the contract out of the operation of the statute [of frauds].").

Accordingly, the salient question is whether the agreement between the Edwards entities and CHFS pertaining to the repayment of Mortgage Portfolios #3-6 had an indefinite duration for repayment and was susceptible of performance within fifteen months.[12] To answer this question, the bankruptcy court looked to the terms of the underlying subprime loans that comprise the larger Mortgage Portfolios. The bankruptcy court reasoned that "[b]ecause the loans that comprise Portfolios #3-#6 are all for terms longer than five (5) years, . . . the loans to CHFS to purchase Portfolios #3-#6 could not be performed within the space of fifteen (15) months and, therefore, are unenforceable against the estate."

We will affirm the bankruptcy court's findings if its "'account of the evidence is plausible in light of the record,' even if we 'would have weighed the evidence differently.'" *Matter of Trendsetter HR L.L.C.*, 949 F.3d 905, 910 (5th Cir. 2020) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). The bankruptcy court's determination that CHFS could not repay the Edwards entities until it had collected on the underlying loans in

---

[12] The record belies any cursory suggestion that the Edwards entities fully performed under Mortgage Portfolios #3-6, inasmuch as the Edwards entities had continuing service and fee obligations.

the Portfolios—which would take more than five years, based on the terms of the loan agreements—is "plausible in light of the record." *Id.* We agree that the agreement between the Edwards entities and CHFS was not performable within a fifteen-month period. As such, we affirm the district and bankruptcy courts' conclusion that the Edwards entities' right to repayment for their funding of Mortgage Portfolios #3-6 was barred by the statute of frauds

B.

The Edwards entities further contend that while the bankruptcy court correctly identified the unrecouped, combined value of Mortgage Portfolios #1-2 and rightly deemed that amount to be a secured loan to CHFS of $1,778,804, the bankruptcy court "reached [an] unreasonable result by arbitrarily adopting a valuation model put forward by the Trustee through her expert" for the two portfolios. The Edwards entities argue that the bankruptcy court itself found the underlying notes at issue were owned by the estate and, as such, that "[t]he valuation model that the bankruptcy court accepted was based on assumptions that the bankruptcy court's findings had expressly rejected."

This court has previously held that "[v]aluation is a mixed question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusion being subject to *de novo* review." *In re Stembridge*, 394 F.3d 383, 385 (5th Cir. 2004) (citation omitted). As we have observed, the Bankruptcy Code "leaves valuation questions to judges" to resolve "on a case-by-case basis." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 697 (5th Cir. 1990).

Here, the bankruptcy court opinion does not elaborate on the reasoning behind its valuation method. The bankruptcy court simply adopted valuations for Mortgage Portfolio #1-2 proposed by the Trustee's expert,

accountant Jeffrey N. Aucoin that is $788,611.[13] In one prior case, we concluded that a bankruptcy court's proposed valuation was unreviewable because the bankruptcy court had not given specific reasons for its choice of valuation method. *See Matter of Missionary Baptist Found. of Am., Inc.*, 796 F.2d 752, 760-61 (5th Cir. 1986). Although they did not provide an alternative valuation, the Edwards entities did point out a problem underlying the bankruptcy court's valuation: The bankruptcy court found that Mortgage Portfolios #1 and #2 were loans to CHFS, but then assumed they were joint ventures for purposes of the valuation. This classification leads to a big difference in the money that EFP is owed. Our court's analysis of the issue indicates that if the portfolio agreements are loans, EFP is entitled to the entire loan payment from CHFS (which is the secured interest of $1,728,804); if they are joint ventures, EFP is only entitled to the money from the mortgage collection.

Upon review, we conclude this uncertainty is sufficient to merit further consideration by the bankruptcy court, in order for the court to determine how much money EFP is owed for Mortgage Portfolios #1 and #2 and to explain why the court's valuation of these portfolios is correct. Accordingly, we remand solely this issue of the valuations of Mortgage Portfolios #1-2 to the bankruptcy court.

---

[13] We note that factual findings made by the bankruptcy court that are drawn from assessments of witness credibility are granted additional deference because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)).

No. 20-61011

## C.

According to the Edwards entities, while the bankruptcy court correctly identified Mortgage Portfolio #7 as a joint venture, the bankruptcy court's decision to disallow this claim "should be vacated and remanded for reasonable reevaluation of the amounts owed to the Edwards Entities for Mortgage Portfolio 7."  The Edwards entities correctly assert that the bankruptcy court did not offer any analysis or consideration of this issue beyond its disallowance of the claim in the concluding section of its opinion. Due to the absence of any analysis, EFP and BHT ask this court to remand this issue for "reasonable reevaluation of the amounts owed to the Edwards entities for Mortgage Portfolio 7."

"The court to which [a bankruptcy] claim or cause of action is removed may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b).  We have previously recognized that fact and subject matter determinations, when presented to the court of appeals in the first instance, are best resolved by the bankruptcy court.  *See In re Baron*, 593 F. App'x 356, 361-62 (5th Cir. 2014) (finding the determination of whether a creditor's right to seek relief in a bankruptcy matter may be enjoined by a district court is "best left to the bankruptcy court on remand" when the issue was raised before the bankruptcy court, but the court did not address the issue).  *See also Matter of T-H New Orleans Ltd. P'ship,* 10 F.3d 1099, 1103 (5th Cir. 1993) (same).  Given the summary disallowance of this issue, as well as both parties' acknowledgement that the issue remains unresolved, we remand this issue to the bankruptcy court.

## IV.

## A.

Trustee Johnson argues that the 2010 Assignment of the Home Improvement Line loans is void and cannot be cured post-petition "for the

reasons . . . determined by the bankruptcy court." Johnson argues that she has standing to challenge the 2010 Assignment of the HIL loans—despite not being a party to the Assignment—pursuant to statutorily granted authority under several sections of the federal Bankruptcy Code. While the bankruptcy court determined that the 2010 Assignment was valid, the bankruptcy court also concluded that it would be unfair to treat Edwards's 2010 Assignment as lawful because of intervening periods of non-compliance with local laws by the assignee entities. *See* On these grounds, the bankruptcy court voided the 2010 Assignment. In response, the district court stated that "it was an abuse of discretion [for the bankruptcy court] to even consider" such arguments and deemed the 2010 Assignment to be valid.

We examine the question of whether Johnson has standing to challenge the 2010 Assignment de novo. *See Friends of St. Frances Xavier Cabrini Church v. Fed. Emergency Mgmt. Agency,* 658 F.3d 460, 466 (5th Cir. 2011) ("Standing is a question of law reviewed de novo by this court."). We recently held in a related dispute that bankruptcy trustees generally have standing, as a party of interest, to challenge any matters concerning the bankruptcy estate. *See Matter of Cmty. Home Fin. Servs.*, Inc., 990 F.3d 422, 427 (5th Cir. 2021). In that case, we explained that a bankruptcy trustee "is distinct from all other bankruptcy parties because the trustee is responsible for the administration of the bankruptcy estate." *Id.* at 426. Accordingly, the "trustee's standing comes from the trustee's duties to administer the bankruptcy estate, not from any pecuniary interest in the bankruptcy." *Id.* at 427. Similarly, in an earlier case, we held that "the bankruptcy trustee is the real party in interest with respect to claims falling within the bankruptcy estate." *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 362 (5th Cir. 2014). Because a challenge to the validity of the 2010 Assignment is directly linked to the bankruptcy estate, Trustee Johnson has standing to raise questions about the legitimacy of the Assignment.

Nevertheless, Johnson offers no substantive legal or factual reason why this panel should reverse the district court's conclusion that the 2010 Assignment is valid. On appeal, "the burden is on the appellants to show error." *Murphy v. St. Paul Fire & Marine Ins. Co.*, 314 F.2d 30, 31 (5th Cir. 1963). Because Johnson has not met her burden of demonstrating that the district court erred, we affirm the district court's conclusion that the 2010 Assignment is valid.

### B.

Trustee Johnson also asks this court to overturn the district court's determination that the Edwards entities have a perfected security interest in the HIL loans. In response, the Edwards entities maintain they hold a perfected security interest in the HIL loans pursuant to the Rainbow Loan Agreement and the Custodial Agreement, emphasizing "the dispositive significance under the UCC of the custodian's continuing possession of the tangible instruments at issue."

We look to state law to determine if a security interest is perfected. *Matter of Locklin*, 101 F.3d 435, 438 (5th Cir. 1996). Under the Mississippi U.C.C., a party has a perfected secured interest in a tangible instrument when another party has taken possession of the instrument "after having authenticated a record acknowledging that it will hold possession for the secured party's benefit." Miss. Code Ann. § 75-9-313(c)(2). Here, it is undisputed that Rainbow Group held a perfected security interest in the HIL loans, pursuant to this statutory provision, based on the Custodial Agreement and Rainbow Loan Agreement between the McCarley Firm, Rainbow Group, and CHFS. However, the critical question is whether Appellants EFP and BHT also possess a perfected security interest in the HIL loans under the same theory, given that the Custodial Agreement does not name these entities as beneficiary parties or lenders.

No. 20-61011

Mississippi law states that "[i]f a secured party assigns a perfected security interest . . . , a filing . . . is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor." Miss. Code Ann. § 75-9-310(c); *see also id.* cmt. 4 ("Subsection (c) . . . . provides that no filing is necessary in connection with an assignment by a secured party to an assignee in order to maintain perfection as against creditors of and transferees from the original debtor."). The statute confirms that Edwards did not have to amend or re-perfect the Custodial Agreement or security interest upon its assignment from Rainbow Group to the Edwards entities. As such, the Edwards entities would hold a perfected security interest in the HIL loans under a continuous possession theory.

Nevertheless, the bankruptcy court determined that the analysis could not end there because the parties had "varied by agreement" the continuous-perfection provision of § 75-9-310(c), affirmatively requiring Edwards to re-perfect his security interest every time he assigned the note to a new entity under the terms of the Custodial Agreement. *See* Miss. Code Ann. § 75-1-302 ("Except as otherwise provided . . . , the effect of provisions of the Uniform Commercial Code may be varied by agreement."). The bankruptcy court based this conclusion on Section 5.7 of the Custodial Agreement.[14]

"Generally, courts look to the 'four corners' of the contract to ascertain its meaning." *Harrison Cty. Com. Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 959 (Miss. 2013). However, "separate agreements executed contemporaneously by the *same parties*, for the same purposes, and

---

[14] Section 5.7 of the Custodial Agreement states: "No party hereto shall sell, pledge, assign or otherwise transfer this Agreement without the prior written consent of the other parties hereto."

as part of the same transaction, are to be construed together." *Sullivan v. Mounger*, 882 So. 2d 129, 135 (Miss. 2004). Accordingly, we must review the Custodial Agreement and the Rainbow Loan Agreement for the HIL loans in conjunction with one another. Section 5.7 of the Custodial Agreement mandates that parties to the agreement may not "transfer *this Agreement* without the prior written consent of the other parties" Section 9.6 of the Rainbow Loan Agreement states that the original lender may at any time assign or transfer the rights and duties of lender to another party and that party would be "DEEMED TO BE THE 'LENDER' UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WITH THE AUTHORITY TO EXERCISE SUCH RIGHTS IN THE CAPACITY OF THE LENDER." The agreement does not require the lender to seek approval or sign-off or to even notify the other parties prior to re-assignment.

Read in conjunction with one another, these contract provisions support the district court's determination that "everyone would have to agree in writing before they could change *the custodian* of the mortgages. The lender can change at any time. The custodian can't." This reading of the contractual provisions is further supported by the trial testimony of Harold McCarley, Jr., the custodian of the loan documents. McCarley stated that "he understood he was the bailee of the Home Improvement Loans for the 'lender' under the Custodial Agreement and that at some point, the 'lender' changed from Rainbow Group, Ltd. to Beher Limited." McCarley also testified that he "took instruction from Edwards as to the identity of the lender." For these reasons, we affirm the district court's conclusion that the Edwards entities have a perfected security interest in the Home Improvement Line notes.

No. 20-61011

V.

The Edwards entities argue that the bankruptcy court erred in concluding that, because the Edwards entities could not trace the assets stolen by Dickson to the funds recovered by the Trustee, EFP and BHT do not hold a security interest in those funds. The Edwards entities also contend that they should maintain their security interest in the stolen funds, despite those funds having been co-mingled, based on the application of "equitable principles" under the terms of the Mississippi U.C.C.

The district court opinion did not reach the tracing issue, so we review the bankruptcy court's decision on this matter directly. Under Mississippi's governing rules for security interests in commingled goods, when goods become commingled—that is, when identity of the collateral has become lost—the security interest no longer exists in the commingled goods. *See* Miss. Code Ann. § 75-9-336(b) ("A security interest does not exist in commingled goods…"). Since the original goods can no longer be identified, the rules pertaining to security interests in those goods (including particularly transfer or creation of a security interest in those original goods) are inapplicable, even though the goods still exist in some form. *See id.* cmt. 3 ("[T]he security interest in the specific original collateral alone is lost once the collateral becomes commingled goods, and no security interest in the original collateral can be created thereafter…"). However, a security interest remains attached to "[p]roceeds that are commingled with other property . . . to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law." *Id.* § 75-9-315(b)(2).

Pursuant to the express language of Mississippi's statute, the burden lies with the secured party—the Edwards entities—to identify the proceeds in question "by a method of tracing." However, EFP and BHT do not

22

No. 20-61011

provide this court with "a method of tracing" to identify the proceeds in question.  Instead, they ask this court to apply "equitable principles" to retain their secured interest in the comingled funds.  Yet, the Edwards entities offer no explanation or pertinent caselaw on how the application of equitable principles might serve as a method of tracing the funds, other than simply to state that such principles would mandate the security interest remain intact.

We have previously explained that "adherence to specific equitable principles, including rules concerning tracing analysis are 'subject to the equitable discretion of the court.'" *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996) (quoting *In re Intermountain Porta Storage, Inc.*, 74 B.R. 1011, 1016 (D.C. Colo. 1987)).  However, "when performing a judicial function by interpreting a state statute—which limits his discretion and is not merely a standardless grant of authority—a judge acts to *implement* state policy rather than *create* policy." *Boston  v. Lafayette Cty., Miss.*, 743 F. Supp. 462, 470 (N.D. Miss. 1990).  Creating new policy about the application of equitable principles in this matter is not the appropriate role of this court.  For this reason, we affirm the bankruptcy court's holding that the Edwards entities failed to meet their burden of tracing the recovered funds.

## VI.

## A.

Trustee Johnson challenges the district court's decision to vacate and remand the bankruptcy court's ruling that Edwards's post-petition conduct was violative of federal law.  Specifically, Johnson argues that the bankruptcy court was correct in determining that Edwards's attempts to acquire information about Dickson and CHFS's operations in South America, after the bankruptcy proceedings began, amounted to a violation of the automatic stay imposed pursuant to 11 U.S.C. § 362(a)(3).  Accordingly, Trustee

No. 20-61011

Johnson urges this court to reinstate the award of damages granted by the bankruptcy court pursuant to 11 U.S.C. §§ 362(k) and 105(a). In response, EFP and BHT contend the bankruptcy court applied erroneous standards when considering Johnson's claims and, moreover, that the court's damages award was based on speculation or conjecture.

A bankruptcy petition automatically stays numerous proceedings against the debtor and the estate. *See* 11 U.S.C. § 362(a). "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* § 362(k)(1). Though we have previously held that both debtors and creditors have prudential standing to sue under § 362(k), we have expressly declined to consider the question of whether bankruptcy trustees have prudential standing to assert an automatic-stay violation claim. *See St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 543, 545 (5th Cir. 2009).

As the district court explained, the bankruptcy court "sidestepped the question of the Johnson's standing under § 362(k) to pursue damages for an automatic stay violation," instead determining that it "could sanction Dr. Edwards under its contempt power." *See* 11 U.S.C. § 105(a). Although the bankruptcy court cited its § 105 contempt power as the source of its authority to make this ruling, it analyzed the issue under § 362(k). To establish civil contempt under § 105, however, Edwards's conduct must have been shown, "by clear and convincing evidence," to be in violation of "a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Piggly Wiggly*, 177 F.3d at 382. Here, there is no finding by "clear and convincing evidence" that Edwards's post-petition conduct met this threshold. Accordingly, we affirm *only* the district court's decision to vacate the bankruptcy court's ruling on this matter.

24

No. 20-61011

B.

Trustee Johnson further suggests that Edwards's failure to provide to the bankruptcy court, as well as Johnson's, the information and/or physical materials he acquired as a result of his independent inquiries "constituted a . . . disruption of the bankruptcy process" that amounted to an improper conversion of estate property. Under Mississippi law, "[c]onversion requires the intent to exercise dominion or control over goods inconsistent with the true owner's rights and is a result of conduct intended to affect property." *Greenlee v. Mitchell*, 607 So. 2d 97, 111 (Miss. 1992). Conversion is deemed to have occurred once an individual has taken possession of an item from its owner. *Walker v. Brown,* 501 So. 2d 358, 361 (Miss. 1987). "It is elementary that ownership is an essential element of conversion." *Cmty. Bank, Ellisville, Mississippi v. Courtney*, 884 So. 2d 767, 772 (Miss. 2004).

The district court determined that the bankruptcy court had committed a "clear error" in determining that Edwards's receipt of the CDs constituted a conversion of estate property. The district court reasoned that because the CDs did not come from CHFS or the Trustee, but rather from Meehan, a non-party in this matter who willfully provided the discs to Edwards, the physical CDs themselves were not the tangible property of the estate.[15] We agree. Because Edwards could not have converted estate property if the property in question did not belong to the estate, we affirm the district court's reversal of the bankruptcy court on this issue.

---

[15] Trustee Johnson also alleges that an action for conversion is appropriate in this case due to Edwards's possession of intangible information that was stored on the CDs he received from Meehan. However, Mississippi law is clear that this type of intangible property cannot constitute the basis for a conversion claim. *See Holbert v. Wal-Mart Assocs.*, 2011 WL 3652202, at *3–4 (S.D. Miss. Aug. 18, 2011); *Directv, Inc. v. Hubbard*, 2005 WL 1994489, at *4 (N.D. Miss. Aug. 17, 2005).

No. 20-61011

VII.

For the foregoing reasons, we AFFIRM the district court's decision in part, REVERSE in part, and REMAND the case for reconsideration of the issue of the collections of Mortgage Portfolio #7.